CANDACE C. CARLYON, ESQ.
Nevada Bar No. 2666
TRACY M. O'STEEN, ESQ.
Nevada Bar No. 10949
CLARK HILL PLC
3800 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone:    (702) 862-8300
Facsimile:    (702) 862-8400
CCarlyon@ClarkHill.com
TOSteen@ClarkHill.com

VAN C. DURRER, II, ESQ.
(*pro hac vice pending*)
ANNIE LI, ESQ.
(*pro hac vice pending*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
300 S. Grand Avenue, Suite 3400
Los Angeles, CA 90071
Telephone:    (213) 687-5000
Facsimile:    (213) 687-5600
Van.Durrer@Skadden.com
Annie.Li@Skadden.com

*[Proposed] Counsel for Debtors in Possession*      *[Proposed] Counsel for Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re

DC SOLAR SOLUTIONS, INC.,

Debtor.

Case No.: BK-19-50130-btb
Chapter 11

Proposed Joint Administration with:

| 19-50102-btb | Double Jump, Inc. |
|---|---|
| 19-50103-btb | Dora Dog Properties, LLC |
| 19-50104-btb | Dog Blue Properties, LLC |
| 19-50105-btb | Brandy Boy Properties, LLC |
| 19-50106-btb | 475 Channel Road, LLC |
| 19-50108-btb | Park Road, LLC |
| 19-50109-btb | 140 Mason Circle, LLC |
| 19-50131-btb | DC Solar Distribution, Inc. |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING, (II) SCHEDULING FINAL HEARING, AND (III) GRANTING RELATED RELIEF**

Hearing Date:  OST Requested
Hearing Time:  OST Requested

Double Jump, Inc. ("Holdings") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), hereby move (this "Motion") this Court for entry of interim and final orders under sections 105, 362, 363, 364, 503(b), 507, and 1107 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules

2002, 4001, 9006, and 9014 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Nevada (the "Local Bankruptcy Rules") (i) authorizing the Debtors to obtain postpetition secured financing, (ii) scheduling a final hearing, and (iii) granting related relief. In support of the Motion, the Debtors rely upon and incorporate by reference the *Omnibus Declaration of Seth R. Freeman in Support of the First Day Motions* (the "First Day Declaration")[1] and the *Declaration of Seth R. Freeman in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Secured Financing, (II) Scheduling Final Hearing, and (III) Granting Related Relief* (the "DIP Declaration") filed with the Court concurrently herewith. In further support of the Motion, the Debtors, by and through their undersigned proposed counsel, respectfully represent as follows:

## I.
## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for relief requested herein are sections 105, 362, 363, 364, 503(b), 507, and 1107 of the Bankruptcy Code. Such relief is also warranted under Rules 2002, 4001, 6003, and 9014 of the Bankruptcy Rules, and Rules 2002, 4001, 9006, and 9014 of the Local Bankruptcy Rules.

3.      Pursuant to Rule 9014.2 of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## II.
## BACKGROUND

4.      On January 30, 2019 (the "Petition Date"), Holdings and the Real Estate Debtors (as defined below) each commenced a case by filing a petition for relief under chapter 11 of the

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

Bankruptcy Code, and on February 3, 2019, DC Solar Solutions, Inc. and DC Solar Distribution, Inc. each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

5.    The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.    To date, no creditors' committee has been appointed in these Chapter 11 Cases by the Office of the United States Trustee for the District of Nevada (the "United States Trustee").  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

7.    DC Solar Solutions, Inc., DC Solar Distribution, Inc., and DC Solar Freedom, Inc.[2] (together, "DC Solar" or the "Company") has become the largest manufacturer of mobile solar generators over the last decade.  The Company designs, manufactures, and distributes mobile solar generators, mobile solar EV chargers, mobile solar light towers, and mobile solar power stations to private enterprises, municipalities, and universities.  The Company was founded in 2009, and today has deployed its units across the United States.

8.    In addition to DC Solar Solutions, Inc. and DC Solar Distribution, Inc., the Debtors are comprised of Double Jump, Inc., which holds 100% of the stock in DC Solar Solutions, Inc. and DC Solar Distribution, Inc., as well as six limited-liability companies which primarily hold real estate assets (both commercial and residential) for rent or lease, being Dog Blue Properties, LLC; Dora Dog Properties LLC; Brandy Boy Properties, LLC; 475 Channel Road, LLC; 140 Mason Circle LLC; and Park Road LLC (collectively, the "Real Estate Debtors").  The assets of the Real Estate Debtors will be pledged as collateral in connection with the DIP Facility described in the First Day Declaration.

9.    As set forth in the First Day Declaration, on December 18, 2018, the federal government seized funds from and froze all bank accounts associated with the DC Solar businesses, allegedly in connection with "investment fraud" perpetrated by the Company.  On the

---

[2]    The Debtors in the above-captioned cases anticipate that Freedom will file its own chapter 11 petition promptly, and will seek joint administration of its chapter 11 case together with the above-captioned cases.

3

same day, agents from the FBI and the IRS executed sweeping search and/or seizure warrants of the DC Solar business headquarters located in Benicia, California. Agents seized hundreds of items essential for the Company to conduct and operate its ongoing businesses, including, but not limited to, computer servers, computers, and hard copy files containing corporate books and records, investment agreements, lease agreements, vendor agreements, communications with investors and customers, and invoices for insurance and utility providers. Left without any liquid assets to fund the Company's business or basic communications and record-keeping infrastructure, the Company was forced to shut down and lay off its entire workforce the week before Christmas. Approximately 100 employees were laid off, and the Company was unable to pay wages owed to those employees. Following the seizure, the Company has continued to receive strong support from its employees, its customers, its partners, and its investors. Buoyed by the support of its key constituencies, the Company is securing debtor-in-possession financing and commenced these Chapter 11 Cases in order to reopen its business operations so that it may continue to serve its customers and stakeholders, compensate its employees, and continue to deliver and develop its best-in-class products and services for the benefit of all constituencies. The DC Solar companies and Double Jump, Inc. have also engaged new independent directors to aid with the reorganization process.

10. Additional factual background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to these Chapter 11 Cases, is set forth in detail in the First Day Declaration.

**A.    Prepetition Secured Loans**

11. The Real Estate Debtors collectively own thirty-eight (38) commercial and residential properties located in California, Texas, Arizona, Nevada, and Mexico (collectively, the "Real Property Collateral"). Those properties include the Company's headquarters in Benicia, California, small commercial properties leased to commercial tenants, and condominiums and other residential properties rented to residential tenants. The properties are managed by the respective owner entities. Historically, the lease and rental revenues generated by the Real Property Collateral have been largely sufficient to satisfy necessary expenses to manage the Real

4

Property Collateral, including maintenance, taxes and insurance.  The Debtors were unable to identify any potential lender who would lend exclusively to the Company based on the strength of the Company's available collateral.  Every potential lender who submitted a term sheet required a lien on the Real Property Collateral in order to be able to provide the financing.  A list of the Real Property Collateral is attached to the DIP Term Sheet as Exhibit A thereto.

12.    As noted in the First Day Declaration, the Company has no issued or funded debt, and the Company's assets are unencumbered.  However, the real property assets of the Real Estate Debtors are subject to certain mortgages and liens, as summarized below.  The Debtors have listed all mortgages and properly perfected liens of which they are aware; however, as noted in the First Day Declaration, the Debtors' assets were seized by the government on December 18, 2018, and to the extent any notices of perfection of additional liens were included in the records and documents seized, the Debtors reserve the right to supplement this list at a later date.  The Debtors have provided notice of this Motion to all mortgage lenders and secured parties of which the Debtors are aware, and will provide supplemental notice of this Motion and of any orders entered by this Court in connection with this Motion to any and all additional secured parties within two (2) business days of identifying such parties.

13.    Mortgages.  A list of the Real Property Collateral and a description of the secured interests thereon (including the identity of the secured party and the amount outstanding on the underlying loan obligation) is attached to the DIP Declaration as Exhibit A thereto.  There are three mortgages on various pieces of commercial properties.  The mortgages are held by Heritage Bank of Commerce or CTBC Bank, and the total amount of the underlying secured obligations is approximately $10,379,498.70.  As a result of the seizure, at least two of the mortgage payments for the commercial properties are delinquent.  Debtor entity 140 Mason Circle LLC received a default notice from lender Heritage Bank of Commerce dated as of January 14, 2019.

14.    Mechanics Liens.  The Debtors have received numerous notices from various contractors and other parties claiming unpaid amounts and, in certain cases, asserting mechanics' liens over the subject property.  The Debtors are reviewing the notices received to determine

1  whether any counterparties have properly perfected mechanics' liens on the Real Property

2  Collateral under applicable state law.

3  **B.    The Debtors' Need for DIP Financing and Lack of Available Alternatives**

4        15.    As described in the First Day Declaration, the Debtors and their professionals have

5  approached seven (7) potential financing sources in order to secure financing that would support

6  the Company's go-forward operations.  Ultimately the Debtors secured four (4) indications of

7  interest, and after evaluating the proffered terms, and engaging in an arms-length negotiation

8  process, the Debtors negotiated and executed a binding term sheet (the "<u>DIP Term Sheet</u>") with

9  B.H. Capital Ventures, LLC (the "<u>Lender</u>"), a copy of which is attached hereto as <u>Exhibit A</u>.

10       16.    The DIP Term Sheet contemplates a proposed debtor-in-possession financing

11 facility (the "<u>DIP Facility</u>") of either $20.5 million (for a senior secured facility), or $10 million

12 (for a junior secured facility).  In the event that Lender chooses to implement a senior secured

13 facility, existing prepetition mortgages on the Real Property Collateral will be satisfied in full in

14 cash using the proceeds of the DIP Facility.

15       17.    Due to the government's seizure of substantially all of the Company's assets, the

16 Company was unable to raise financing on an unsecured basis, and the Company lacks any

17 available cash which it may utilize to fund these Chapter 11 Cases or the Debtors' operations on an

18 out-of-court basis.  Without access to seized assets, and without cash available to fund operations,

19 the Company's available financing options are practically non-existent.  As  a result, the Carpoff

20 family has decided to utilize their real property assets, held through the Real Estate Debtors, to

21 finance the Company's continued operations for the benefit of all stakeholders.

22       18.    Absent the proposed DIP Facility, the Debtors lack funds to re-start the Company's

23 operations and pursue a value-maximizing sale transaction.  The Debtors believe that a going-

24 concern exit transaction would secure the most value for their stakeholders, especially the

25 investment funds, who stand to forfeit substantial value if the mobile solar generator units are

26 removed from service prior to the expiration of the recapture period.  The proceeds of the DIP

27 Financing are necessary for such basic expenses as insurance and taxes, which are essential to

28 preserving the value of the Debtors' assets, including the Properties, for the benefit of all

stakeholders.  The proposed DIP Facility provides the Debtors with the support and the breathing room necessary to market the Company's assets and support operations in order to achieve a going-concern transaction.

19.    The proposed DIP Facility also benefits the Real Estate Debtors, whose bank accounts and cash assets were also subject to seizure by the government.  Without immediate funds or access to bank accounts, the Real Estate Debtors are unable to cash rent checks from tenants or provide basic property management services to those tenants, including payment of utility bills.  Some of these services are required under applicable state law.  An immediate cash injection from the DIP Facility, along with the relief sought in other first-day motions filed concurrently herewith, will allow the Real Estate Debtors to continue to provide necessary services to tenants.

20.    Notably, the Lender is <u>not</u> seeking to prime any existing mortgage on any real estate asset.  Instead, the Lender will either (a) pay off existing mortgages in full, or (b) take a subordinated position behind existing mortgages and other properly perfected security interests in place as of the Petition Date.  The Debtors are aware of eight (8) liens and mortgages existing as of the Petition Date, totaling $11,080,028.28.[3]   There are also total estimated unsecured claims of approximately $920,137.00.  Therefore, the total obligations owed by the Real Estate Debtors in liens, mortgages, and unsecured claims are approximately $12,000,165.28.  The Debtors believe that the aggregate current property value significantly exceeds the aggregate sum of these existing prepetition obligations.  Accordingly, the Carpoff family as equity holders are the only parties that bear the risk of the DIP Financing, not the Company.  The Carpoff family is consenting to the relief requested in this Motion.

### III.
### <u>RELIEF REQUESTED</u>

21.    As required by Bankruptcy Rule 4001(c)(1)(B), the Debtors state the following:[4]

---

[3]    The Debtors are using consolidated values across all Real Estate Debtors in paragraph 20 above.

[4]    The Debtors and the Lender are in the process of finalizing the Interim Order, and will submit such order promptly.  To the extent that the Interim Order contains provisions inconsistent with this statement under Bankruptcy Rule 4001(c)(1)(B), the Debtors will note and describe such changes during any hearing held by the

*(cont'd)*

a. The borrowers are each of the Debtors (the "<u>Borrowers</u>");

b. The principal amount is either $20,500,000.00, for a senior secured term loan, or $10,000,000.00 for a junior secured term loan (the "<u>Loan Amount</u>"), to be advanced in stages:

    i. First advance of $3,000,000.00 (the "<u>Initial Advance</u>") to be made immediately following the entry by this Court of an interim order satisfactory to Lender approving the Term Sheet; and

    ii. A subsequent advance of the balance of the Loan Amount (the "<u>Subsequent Advance</u>") subject to satisfaction of the conditions precedent outlined below;

c. The DIP Facility shall be secured by the following liens, priority claims, and security interests:

    i. For a senior secured DIP Facility, pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first priority security interest and lien on the Real Property Collateral in the form of (i) a Deed of Trust on each property located within the United States that is recorded in the Official Records of the applicable County; and (ii) a pledge and a UCC-1 financing statement with respect to the membership or other ownership interest in each Borrower that owns properties located in Mexico that is filed with the Secretary of State of the applicable State;

    ii. For a junior secured DIP Facility, pursuant to Section 364(c)(3) of the Bankruptcy Code, a perfected junior security interest and lien on the Real Property Collateral subject to all perfected secured debt against such Real Property Collateral existing on the day of the Interim Order in the form of (i) a Deed of Trust on each property located within the United States that is recorded in the Official Records of the applicable County; and (ii) a pledge and a UCC-1 financing statement with respect to the membership or other ownership interest in each Borrower that owns properties located in Mexico that is filed with the Secretary of State of the applicable State;

    iii. Pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first priority security interest and lien on the Collateral[5] of each

---

*(cont'd from previous page)*

Court on this Motion.  In the event of any discrepancies between this summary and the DIP Term Sheet or the Interim Order, the DIP Term Sheet or the Interim Order shall control, as applicable.

[5]  "<u>Collateral</u>" means all property of the Debtors and their estates (now or hereafter acquired and all proceeds thereof), including, but not limited to, real property (leased and owned), assignment of rents, inventory, accounts, equipment, chattel paper, documents, instruments, copyrights, trademarks, trade names, and patents and related rights, general intangibles, claims and causes of action (including commercial tort claims), deposit accounts, cash and cash equivalents, and investment property (including interests in subsidiaries), and all accessions and substitutions thereto and proceeds and products thereof, including insurance proceeds thereof; <u>provided</u>, <u>however</u>, that with respect to claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the *(cont'd)*

Borrower that is not the Real Property Collateral (x) to the extent such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date and (y) excluding claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively "Avoidance Actions") (it being understood that notwithstanding such exclusion of Avoidance Actions, upon entry of the Final Order, to the extent approved by the Bankruptcy Court, such lien shall attach to any proceeds of Avoidance Actions);

iv.  Subject to clauses (c)(i) and (c)(ii) above, pursuant to Section 364(c)(3) of the Bankruptcy Code, a junior perfected security interest and lien on any Collateral that is not Real Property Collateral of each Loan Party to the extent such Collateral is subject to valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and/or inchoate mechanics' and materialmens' liens, or to valid and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, subject as to priority to such liens in favor of such third parties; and

v.  Pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the Chapter 11 Case of such Debtor (the "DIP Superpriority Claims");

d.  The interest rate is 12% and the default rate is 17%;

e.  The DIP Facility matures twelve months after the closing date of the DIP Facility (or earlier upon the occurrence of certain accelerating events), but the Borrowers may extend the maturity date by six months upon payment of an extension fee of 1% of the total DIP Facility amount no later than 10 business days prior to the original maturity date;

f.  Fees and expenses include fees of 2%, payable on the maturity date, reimbursement of costs and expenses (including but not limited to legal fees), and a good-faith deposit[6] of $50,000.00;

---

*(cont'd from previous page)*

Bankruptcy Code, the Collateral shall include only the proceeds of such claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, and not the claims or causes of action themselves.

[6]  The good-faith deposit was paid on February 4, 2019.

g.  The Borrowers may prepay the Loan Amount at any time after the first six months of the term, upon providing 30 days' written notice and paying 30 days' interest premium;

h.  The Borrowers may prepay all or any portion of the DIP Facility on three business days' notice without prepayment penalty;

i.  Conditions precedent to a Subsequent Advance include:

   i.  Entry of the Interim Order;

   ii.  Receipt by Lender of all first day pleadings and orders which shall not be adverse to the Lender or inconsistent with the terms of the DIP Facility; and

   iii.  Delivery by the Borrowers, and approval by the Lenders, of the DIP Budgets;

j.  Events of default include:

   i.  Breach of any representations, warranties, covenants, or agreements contained in the final loan documents;

   ii.  Occurrence of any Event of Default under the final loan documents;

   iii.  Conversion of any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or dismissal of any of these Chapter 11 Cases;

   iv.  Appointment of a chapter 11 trustee or an examiner in any of the Chapter 11 Cases;

   v.  Failure to obtain entry of a Final Order in form and substance acceptable to the Lender within thirty (30) days after the Petition Date;

   vi.  Termination of the Debtors' exclusivity period;

   vii.  Filing by any Borrower of a motion to sell assets within the Lender's consent;

   viii.  No waiver of sections 506(c) and 552(b) of the Bankruptcy Code and marshalling in the Final Order;

   ix.  Either of the Interim Order or the Final Order is amended, reversed, stayed, vacated, extended, or modified in a way which is not acceptable to the DIP Lender;

   x.  The automatic stay is lifted to allow a third party to proceed against any material asset of the Borrowers;

   xi.  Any Borrower files a motion to obtain alternative financing or use Collateral without consent of the DIP Lender; and

   xii.  Breach of any representation, warranty, covenant, or agreement contained in the final loan documents;

k.  The Interim Order shall provide that this Court deem that the Lender's liens on the Collateral are properly perfected immediately upon this Court's entry of the Interim Order notwithstanding any applicable non-bankruptcy law;

l.  Carve-out:

    i.  The liens and super-priority claims granted to the Lender pursuant to the Interim Order and the Final Order shall, in each case, be subject to and subordinate to a carve-out (the "<u>Carve-Out</u>") for the payment of (a) following the occurrence of a Triggering Event (as defined below), (i) allowed or subsequently allowed professional fees and expenses incurred by the Debtors in an aggregate amount not to exceed $500,000 for services rendered and expenses incurred upon and after the occurrence of a Triggering Event, and (ii) allowed or subsequently allowed professional fees and expenses incurred by a statutory committee of unsecured creditors appointed in the Chapter 11 Cases (the "<u>Committee</u>") in an aggregate amount not to exceed $150,000 for services rendered and expenses incurred upon and after the occurrence of a Triggering Event (the amounts in items (i) and (ii) being collectively, the "<u>Carve-Out Amount</u>" and any such payments being "<u>Carve-Out Payments</u>") and (iii) fees pursuant to 28 U.S.C. § 1930 and any fees payable to the clerk of the Bankruptcy Court, and (b) without reducing the Carve-Out Amount, all allowed or subsequently allowed professional fees and expenses incurred by the Debtors and the Committee for services rendered and expenses incurred prior to a Triggering Event, to the extent specifically set forth in the DIP Budgets (as defined in the Term Sheet).

    ii.  Carve-Out Excluding the Properties: The Carve-Out shall be senior to all liens and claims securing the DIP Facility, and the superpriority claims, and any and all other liens or claims securing the DIP Facility, provided, however, that in no event shall the Carve-Out Amount, the Carve-Out Payments or additional fees under §(iii) and §(b) of the subparagraph above be senior to or take priority over the Lender's DIP Liens on the Real Estate Collateral.

    iii.  Carve-Out Including the Properties: In an amount not less than $500,000, the Carve-Out shall be senior to all liens and claims securing the DIP Facility, and the superpriority claims, and any and all other liens or claims securing the DIP Facility on the Real Estate Collateral in all instances.  In an amount not to exceed $1 million (inclusive of the $500,000 Carve-Out noted above), the Carve-Out shall be senior to all liens and claims securing the DIP Facility, and the superpriority claims, and any and all other liens or claims securing the DIP Facility on the Real Estate Collateral, if, and only if, as of the entry of the Final Order, there is a 50% loan to equity ratio on the Real Estate Collateral in excess of the loan amount. The loan to equity ratio shall be reasonably determined by Lender.

    iv.  As used herein "<u>Triggering Event</u>" shall mean the date the DIP Lender provides notice to the Debtors, with a copy to Debtors' counsel at the address set forth in the Loan Documents, of the termination of the DIP Facility. For clarity, professional fees and expenses payable under the Carve-Out shall only include those fees and expenses that are specifically set forth in the DIP Budgets and that are authorized to be paid pursuant to any administrative fee procedures order entered by the Bankruptcy Court.

v.  No portion of the Collateral, the Carve-Out, or the DIP Facility, shall be used for investigating, preparing for, asserting, commencing, or prosecuting (A) any challenge to the amount, extent, priority, validity, enforceability, or characterization of or the indebtedness under the DIP Facility, (B) any challenge to the validity, priority, perfection, enforceability, or characterization of the liens and security interests securing the DIP Liens (defined below), the collateral securing the Collateral, (C) any other action against the direct or indirect subsidiaries of the Lender, or (D) any challenge of, effort to recharacterize, or defense to either the rights and remedies of the Lender or the Debtors' obligations under the Loan Documents.

m.  There is no provision for the providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under §364 to make cash payments on account of the claim;

n.  There are no provisions determining the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim;

o.  There are no provisions requesting waiver or modification of any Bankruptcy Code provisions or of any applicable Bankruptcy Rules relating to the automatic stay;

p.  There are no provisions requesting waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the Debtors have the exclusive right to file a plan, or request the use of cash collateral under Bankruptcy Code section 363(c);

q.  The Borrowers shall not incur additional postpetition secured debt against the Collateral without the consent of the Lender;

r.  The Lender has the right to credit bid the amount of its claims (in full or in part) in connection with the sale of any of the Borrowers' assets;

s.  There are no provisions establishing deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order;

t.  There are no provisions requesting waiver or modification of non-bankruptcy law provisions relating to the foreclosure or other enforcement of any lien;

u.  The Borrowers agree to indemnify and hold the Lender and its directors, agents, officers, representatives, attorneys, subsidiaries, and affiliates harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or cause of action, and costs and expenses (including reasonable fees, expenses, disbursements, and other charges of outside counsel) incurred, suffered, sustained or required to be paid by an indemnified party by reason of, resulting from or related to the DIP Facility or transactions contemplated thereby, except to the extent resulting from the gross negligence or willful misconduct of the indemnified party.  In all such litigation, or the preparation therefor, the indemnified parties shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Borrowers agree to pay promptly the reasonable fees and expenses of such counsel;

v.  The Borrowers (a) grant the Lender a release and waiver of all claims arising in respect of the DIP Facility, (b) waive all claims, rights, and powers to surcharge the Lender, the Collateral, and any other property or assets of the Borrowers subject in any manner whatsoever to the liens and security interests of the Lender (including any replacement liens) pursuant to Section 506(c) or Section 105(a) of the Bankruptcy Code, and (c) waive all rights to a marshaling of the assets of Borrowers and their estates; and

w.  There are no provisions granting any liens on any claims or causes of action arising under Bankruptcy Code sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a), though as noted above, the Collateral shall include proceeds of such actions.

22.     The Debtors propose to serve a copy of any interim order granting this Motion within three (3) business days after entry thereof to the notice parties identified below.  The Debtors further request that the Court (a) set a deadline for filing objections to the Motion and entry of a final order thereon (the "Final Order"), (b) set a final hearing on the Motion, and (c) enter the Final Order on this Motion at or after such final hearing.

23.     For the reasons set forth herein, the Debtors submit that the relief requested herein is in the best interest of the Debtors, their estates, creditors, stakeholders and other parties in interest, and therefore, should be granted.

### IV.
### BASIS FOR RELIEF AND APPLICABLE AUTHORITY

**A.     Entry Into the DIP Facility Constitutes an Exercise of the Debtors' Sound Business Judgment.**

24.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances. If an agreement to obtain secured credit does not violate the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit.  *See In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts generally defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest").

25.     Although section 364 of the Bankruptcy Code enumerates certain aspects of debtor-in-possession financing facilities, courts in this district may approve financing terms so long as the financing benefits the Debtors' estates and stakeholders.  *See, e.g.*, *In re Def. Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. B.A.P. 1992), in which the court approved post-petition financing which included a first-priority lien over an existing junior creditor, a release of pre-petition claims, and a 10% "enhancement fee."  "Section 364 allows bankruptcy courts to authorize postpetition financing for a Chapter 11 debtor in possession and expressly allows courts to authorize certain protections designed to assure repayment of postpetition lenders. Bankruptcy courts, however, have

regularly authorized postpetition financing arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364." *Id.* Furthermore, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Loan Documents, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.

26.    To determine whether the business judgment standard is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs., Inc.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Helm*, 335 B.R. 528, 538-39 (Bankr. S.D.N.Y. 2006).

27.    Here, the Debtors have satisfied the business judgment standard, and the proposed DIP Facility is in the best interests of the Debtors, their creditors, and all parties-in-interest. As noted above, the Debtors require emergency financing to satisfy important business objections including: re-starting the Company's operations, providing management services to the Real Estate Debtors' commercial and residential tenants, and funding a going-concern sale process for the Company or substantially all of the Company's assets. The proposed DIP Facility is designed to protect the Debtors' assets without creating undue pressure on existing secured parties—the Debtors are not seeking to prime any prepetition secured lender.

28.    Absent approval of the proposed DIP Facility, the Debtors lack funds to re-start their businesses and continue providing services to tenants. An operational shutdown is value-destructive to the Company, for the reasons set forth above and in the First Day Declaration. On the other hand, if the Real Estate Debtors are unable to provide necessary services to commercial and residential tenants, the resulting lease agreement defaults and loss of lease revenue would be costly to the Real Estate Debtors and impede their ability to tender payments to existing mortgage lenders. In addition, failures to provide basic services may, in certain instances, violate applicable state or local laws. If the Real Estate Debtors default on the existing mortgages, the resulting foreclosures by mortgage lenders would be costly and value-destructive, to the detriment of the Real Estate Debtors' various creditors and stakeholders.

**B.      The Debtors Should be Authorized to Obtain Postpetition Financing On a Secured Basis.**

29.      The Debtors propose to obtain financing under the DIP Term Sheet by providing security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide the Lender postpetition security interests in and liens on the Real Property Collateral.  Section 364(c) of the Bankruptcy Code provides:

> (c)      If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
> > (1)      with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> > (2)      secured by a lien on property of the estate that is not otherwise subject to a lien; or
> > (3)      secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

30.      Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, the courts look to whether:

> (a)      the debtor cannot obtain credit unencumbered or without superpriority status;

> (b)      the credit transactions are necessary to preserve assets of the estate; and

> (c)      the terms of the credit agreements are fair, reasonable and adequate.

*See In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *10; *see also In re Crouse Group*, *Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987).  Section 364 of the Bankruptcy Code does not require that a debtor seek alternative financing from every possible lender. Rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien.  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financing institutions in the geographic area); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) ("Section 364(d)(1) does not require the debtor to seek alternate financing from every possible lender."); *In re Aqua Assocs.*, 123 B.R. 192, 195 (Bankr.

1  E.D. Pa. 1991) ("Section 364(d)(1)(A) seemingly requires only a showing that the Debtor has

2  attempted unsuccessfully to obtain credit on better terms from other sources.").

3        31.    Here, the Debtors attempted to obtain financing from multiple lenders, and

4  determined after a review of available alternatives that the proposed DIP Facility represented the

5  best option available to the Debtors.  The Lender is willing to take a junior lien in respect of valid

6  prepetition liens and mortgages, or to pay off senior mortgages in order to obtain a senior lien on

7  the Real Property Collateral.  The Lender is also willing to work cooperative with the Company on

8  non-economic factors, such as a budget variance reporting waiver for the first thirty (30) days of

9  the case, which allows the Company flexibility in gauging the effect of restarting operations before

10 the Company must comply with variance testing.  Furthermore, the interest rate charged by the

11 Lender is well within the range of other debtor-in-possession financing facilities.  *See e.g.*, *In re*

12 *Tatuado Hospitality Management Group, LLC*, Case No. 16-10460 (ABL) (Bankr. D. Nev. Mar.

13 16, 2016 (approving 14% interest rate); *In re Ahern Rentals, Inc.*, Case No. 11-53860 (BTB)

14 (Bankr. D. Nev. Jan. 31, 2012) (approving 16% interest rate); *In re Sungevity, Inc.*, Case No. 17-

15 10156 (KG) (Bankr. D. Del. Apr. 7, 2017) (approving 15% interest rate, payable in kind); *In re*

16 *IMRIS, Inc.*, Case No. 15-11133 (CSS) (Bankr. D. Del. June 24, 2015) (approving 19% interest

17 rate). [7]  The proposed DIP Facility is crucial to preserving the value of the Debtors' assets, and to

18 bridging the Debtor from its filing through the completion of transaction for all or substantially all

19 of the Company's assets.

20 **D.     The Lender is Entitled to Protections under Bankruptcy Code section 364(e)**

21       32.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

22 on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of

23 the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

24 Specifically, section 364(e) provides that:

25           The reversal or modification on appeal of an authorization under this
            section [364 of the Bankruptcy Code] to obtain credit or incur debt,
26           or of a grant under this section of a priority or a lien, does not affect

27 _____

28 [7]        Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of these orders, however, are
          available on request.

> the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

33.    Because "good faith" is not defined in the Bankruptcy Code, courts often look to case law under section 363(m).  3 *Collier on Bankruptcy*, ¶ 364.08 (16th ed. 2018) ("Section 364(e) is consistent with section 363(m), which provides similar protection to a buyer or lessee of property of the estate in a section 363 transaction.").   Bankruptcy courts will look to an absence of "fraud, collusion ..., or an attempt to take grossly unfair advantage of other[s]."  *In re Adams Apple, Inc*., 829 F.2d 1484, 1489 (9th Cir. 1987) (internal citations omitted).    The good faith provision is intended to "overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them that long as they are relying in good faith on a bankruptcy court's approval of the transaction they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge."  *In the Matter of EDC Holding Co., et al.,* 676 F.2d 945, 947 (7th Cir. 1982).  In other words, "[t]he good faith provision in that same section acts to protect the debtor, other creditors and the integrity of the bankruptcy court."  *In the Matter of Ellingsen MacLean Oil Co.*, 65 B.R. 358, 361 (W.D. Mich. 1986), *aff'd sub nom. In re Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987).  Without such protection, "Congressional intent of fostering private investment in failing companies by promoting reliance on a bankruptcy court's authorization would be defeated."  *In re Adams Apple, Inc.*, 829 F.2d at 1488.

34.    The terms of the proposed DIP Facility have been negotiated at arms' length and in good faith, and were ultimately approved by the Debtors' independent director (or  independent manager, as applicable).  The Lender is not an insider of the Debtors or the Debtors' principals.  There is no attempt to take advantage of any creditor of the Debtors—in fact, the Lender is lending into a subordinated position vis-a-vis the Debtors' existing secured creditors, or paying off existing secured creditors in full in cash.  In addition, the Lender is relying on the Interim Order in good

1    faith to extend much-needed emergency financing to the Debtors and their estates, and accordingly

2    a good faith finding is appropriate with respect to the Lender and the proposed DIP Facility.

3    **E.      The DIP Facility Fees Were Negotiated in Good Faith, At Arms' Length, and Should**

4    **Be Approved.**

5         35.      As described above, the Debtors have agreed, subject to Court approval, to pay

6    certain fees described in the DIP Term Sheet.  The Debtors have also agreed to fund reasonable

7    costs and expenses (certain of which have been pre-funded by the Debtors' principals), including

8    without limitation, fees and expenses of the professionals retained by the Lender, as provided for in

9    the DIP Term Sheet without the necessity of filing retention applications or fee applications.

10        36.      These fees and other obligations under the Term Sheet were negotiated in good faith

11   and at arms' length and represent the most favorable terms to the Debtors on which the Lender

12   would agree to make the DIP Facility available. The Debtors considered the fees described above

13   when determining in their sound business judgment that the DIP Facility constituted the best terms

14   on which the Debtors could obtain the postpetition financing necessary to continue their operations

15   pending one or more sales of the assets and prosecute their Chapter 11 Cases, and that paying these

16   fees in order to obtain the DIP Facility is in the best interests of the Debtors' estates, creditors, and

17   other parties in interest.

18        37.      Accordingly, the Court should authorize the Debtors to pay the fees provided under

19   the DIP Term Sheet in connection with entering into those agreements.

20                                              **V.**
                            **IMMEDIATE RELIEF IS NECESSARY**
21                   **TO AVOID IMMEDIATE AND IRREPARABLE HARM**

22        38.      The Court may grant the relief requested in this Motion immediately if the "relief is

23   necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003; see also *In re First*

24   *NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits

25   entry of retention orders on an interim basis to avoid irreparable harm).  The Ninth Circuit has

26   interpreted the language of "immediate and irreparable harm" in the context of injunctive relief.  In

27   that context, the court has instructed that irreparable harm is a continuing harm for which there is

28   no adequate legal remedy.  *See, e.g.*, *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th

1   Cir. 2014).  Furthermore, the harm must be shown to be actual and imminent, not speculative or

2   unsubstantiated.  *See, e.g.*, *Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1019 (9th Cir.

3   2016).  The Debtors submit that for the reasons already set forth herein, the relief requested in this

4   Motion is necessary to avoid immediate and irreparable harm to the Debtors.

### VI.
### WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(H)

7       39.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule

8   6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than

9   cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court

10  orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek

11  in this Motion is necessary for the Debtors to operate without interruption and to preserve value for

12  their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen day

13  stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies

14  immediate relief.

### VII.
### RESERVATION OF RIGHTS

17      40.     Nothing contained herein is or should be construed as: (a) an admission as to the

18  validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim

19  on any grounds; (c) a promise to pay any claim; (d) an assumption or rejection of any executory

20  contract or unexpired lease pursuant to Bankruptcy Code section 365; or (e) otherwise affect the

21  Debtors' rights under Bankruptcy Code section 365 to assume or reject any executory contract with

22  any party subject to this Motion.

### VIII.
### NOTICE

25      41.     Notice of this Motion shall be given to (a) the Office of the United States Trustee

26  for the District of Nevada; (b) the parties listed in the consolidated list of twenty (20) largest

27  unsecured creditors filed by the Debtors in these Chapter 11 Cases; (c) the United States Attorney

28  for the Eastern District of California, Attn: McGregor W. Scott; and (d) any such other party

entitled to notice pursuant to Bankruptcy Rule 2002. The Debtors submit that no other or further notice need be provided.

### IX.
### NO PRIOR REQUEST

42.    No previous request for the relief sought herein has been made to this Court or any other court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## X.
## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form annexed hereto, granting the relief sought herein on an interim basis and granting such other and further relief as may be just and proper.

Respectfully submitted this 4th day of February, 2019.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/    *Van C. Durrer, II*

Van C. Durrer, II, Esq. (*pro hac vice pending*)
Annie Li, Esq. (*pro hac vice pending*)
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Telephone: (213) 687-5000
Facsimile:  (213) 687-5600
van.durrer@skadden.com
annie.li@skadden.com

*[Proposed] Counsel for Debtors*

1
2                              **EXHIBIT A**
3                            **DIP TERM SHEET**
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

February 4, 2019

**Term Sheet for**
**Either $20 Million Senior Secured or $10 Million Junior Secured Debtor-In-Possession Term**
**Loan Facility**
**To DC Solar Solutions, Inc. and Affiliates**

We appreciate the opportunity for B.H. Capital Ventures, LLC ("**Lender**") to submit this proposal to DC Solar Solutions, Inc. and its affiliates (individually and collectively, the "**Companies**") outlining the basic terms upon which Lender, (subject to satisfactory completion of due diligence and underwriting and satisfactory documentation by Lender) will provide debtor-in-possession financing ("**DIP Facility**") secured by a lien on the Collateral and the Properties (defined below). This Term Sheet ("**Term Sheet**") is intended to be binding and committed with respect to the terms and conditions outlined herein, subject to definitive documentation finalized at the time of the final closing.

If this Term Sheet is accepted, the complete terms of the DIP Facility will be reflected in the agreements, instruments, and other documents executed at any time in connection with the DIP Facility, all in form and substance satisfactory to Lender (the "**Loan Documents**"), the execution and delivery of which shall be a condition to the Lender's commitment to fund any portion of the DIP Facility in excess of the First Draw (defined below).

| | |
|---|---|
| *Loan Parties* | The Companies and/or its affiliated entities that are the fee owners ("**Loan Parties**", each a "**Loan Party**") of mutually agreed upon identified commercial and residential properties and undeveloped land located in the States of California, Nevada, Texas and in Cabo San Lucas, Mexico (collectively, "**Properties**", each a "**Property**"), which are listed in Exhibit A, attached hereto, each of which is or intends to be a debtor and a debtor-in-possession in a proceeding in respect of the Companies and such debtors (the "**Cases**") in under chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") to be filed in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**"). |
| *Lender* | B.H. CAPITAL VENTURES, LLC |
| *Loan Amount* | First draw of no more than $3 million in connection with the entry of the Interim Order ("**First Draw**"). At Lender's discretion upon the completion of due diligence, one of two options: (1) $20.5 million (inclusive of all money advanced in the First Draw) as senior secured term loan subject to no other secured debt ("**Senior DIP Facility**"); or (2) $10 million (inclusive of all money advanced in the First Draw) as junior secured term loan subordinate to the existing secured debt ("**Junior DIP Facility**"). Lender shall have a right to pay off the senior lenders if there is a default of those senior loans or default in the Junior DIP Facility and add such amount advanced, plus reasonable attorney's fees and costs, to the Junior DIP Facility. |

BHCV/ DC Solar - Loan Facility Term Sheet

| | |
|---|---|
| **DIP Facility** | **Option 1: Senior DIP Facility:** A senior secured credit facility (the "**Senior DIP Facility**") with a maximum credit amount of $20.5 million (inclusive of the First Draw). Subject to compliance with all other terms, conditions, and covenants contained in the DIP Orders and the Loan Documents, Lender will provide the Loan Parties with an available credit facility to be accessed by the Companies in multiple draws which shall be funded in one or more subsequent draws, as determined by the Companies and subject to Bankruptcy Court Order. |
| | **Option 2: Junior DIP Facility:** A credit facility, subject only to the liens to be identified by the Companies, the Loan Parties and the Lender (the Senior Liens") (the "**Junior DIP Facility**") with a maximum credit amount of $10 million (inclusive of the First Draw). Subject to compliance with all other terms, conditions, and covenants contained in the DIP Orders and the Loan Documents, Lender will provide the Loan Parties with an available credit facility to be accessed by the Companies in multiple draws which shall be funded in one or more subsequent draws, as determined by the Companies and subject to Bankruptcy Court Order. |
| **Term/Maturity Date** | The DIP Facility shall be repaid in full, and the Lender's commitment to make loans under the DIP Facility shall terminate, on the earliest to occur of: (a) the date which is 12 months following the initial funding of the DIP Facility, (b) 45 days after the entry of the Interim Order if the Final Order has not been entered prior to the expiration of such period, (c) the date of the closing of the **Approved Sale** (defined below), (d) the effective date of a plan of reorganization acceptable to the DIP Lender and confirmed pursuant to an order entered by the Court (the "**Plan**"), and (e) the occurrence of an "**Event of Default**" under the Loan Documents, which includes, but not limited to, (i) the entry of an order converting any Companies' chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (ii) the entry of an order dismissing any of the Cases, and, (iii) the entry of an order appointing a chapter 11 trustee or examiner in any of the Companies' chapter 11 Cases, (f) the acceleration of the DIP Facility and the termination of the commitment with respect to such DIP Facility in accordance its terms. The repayment and termination of the DIP Facility shall not be altered, extended, or impaired by any Plan or order of the Bankruptcy Court. |
| | The Loan Parties shall not dispose of any of Lender's Collateral without its written consent and where necessary, subject to Bankruptcy Court approval (an "**Approved Sale**"). In the event of an Approved Sale, all proceeds shall be applied to the outstanding balance of the Senior DIP Loan or Junior DIP Loan (as applicable). |
| | Upon the Companies' written notice, payment of an extension fee in the amount of 1.0% of the total DIP Facility no later than 10 business days before the original Maturity Date, and satisfaction of Lender's extension requirements, the Maturity Date shall be extended for an additional 6 months. |

BHCV/ DC Solar - Loan Facility Term Sheet

818546 02-LACSR02A - MSW

| | |
|---|---|
| *Use of Proceeds* | **Senior DIP Facility**: The proceeds of the loans under the Senior DIP Facility shall be used by the Loan Parties (a) pay in full the Senior Liens, (b) to fund post-petition general corporate needs, including working capital needs, subject to compliance with the DIP Budgets, (c) to pay (subject to the limitations of the Carve-Out) administrative expenses of the Cases, including reasonable fees and expenses of professionals, subject to compliance with the DIP Budgets, (d) to pay all interest, fees, expenses and other obligations due to the Lender as provided under the Loan Documents and the DIP Orders, including, without limitation, all professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by the Lender in connection with the preparation, negotiation, documentation, court approval and administration of the DIP Facility (whether incurred before or after the Filing Date) and (e) to make all adequate protection payments to Lender required in the DIP Orders, subject to compliance with the DIP Budgets.<br><br>**Junior DIP Facility**: The proceeds of the loans under the Junior DIP Facility shall be used by the Loan Parties (a) to fund post-petition general corporate needs, including working capital needs, subject to compliance with the DIP Budgets, (b) to pay (subject to the limitations of the Carve-Out) administrative expenses of the Cases, including reasonable fees and expenses of professionals, subject to compliance with the DIP Budgets, (c) to pay all interest, fees, expenses and other obligations due to the Lender as provided under the and the DIP Orders, including, without limitation, all professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by the Lender in connection with the preparation, negotiation, documentation and court approval of the DIP Facility (whether incurred before or after the Filing Date) and (d) to make all adequate protection payments to Lender and to senior lenders required in the DIP Orders. subject to compliance with the DIP Budgets. The Companies must at all times maintain insurance policies, in amounts and from insurers and otherwise reasonably satisfactory to Lender in all respects. |
| *Interest Rate* | 12% per annum. Interest shall accrue on all outstanding advances and shall be payable in arrears on the first business day of each month until Maturity Date.<br><br>DEFAULT INTEREST RATE: 5% per annum plus the rate otherwise applicable with respect to advances under the DIP Facility. |
| *Upfront and Exit Fees* | 2.0% of the total DIP Facility paid on the Maturity Date. |
| *Closing Date:* | The date on or after the date of the entry of the Interim Order on which all conditions contained in the Loan Documents and the Interim Order have been satisfied or waived by the Lender. |

3 of 11

| | |
|---|---|
| *Prepayment* | At the Companies' discretion, the Companies can prepay all or any portion of the DIP Facility on three business days' notice without prepayment penalty. |
| *Mandatory Prepayments* | The DIP Facility will be subject to customary mandatory prepayments for financing of its type, including, without limitation, prepayments from proceeds of non-ordinary course disposition of any Collateral, incurrence of debt (other than under the DIP Facility), and casualty events involving any Collateral |
| *Security, DIP Liens and Claims* | The obligations of the Companies under the DIP Facility shall, subject to the Carve-Out (as defined below), at all times: <br><br> (a)(1) for the Senior DIP Facility, pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by (A) a perfected first priority security interest and lien on the Properties of each Loan Party in the form of (i) a Deed of Trust on each Property located within the United States that is recorded in the Official Records of the applicable County; and (ii) a pledge and a UCC-1 financing statement with respect to the membership or other ownership interest in each Loan Party that owns Properties located in Mexico that is filed with the Secretary of State of the applicable State; or <br><br> (a)(2) for the Junior DIP Facility, pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by (A) a perfected junior security interest and lien on the Properties of each Loan Party subject to all perfected secured debt against such Properties existing on the day of the Interim Order in the form of (i) a Deed of Trust on each Property located within the United States that is recorded in the Official Records of the applicable County; and (ii) a pledge and a UCC-1 financing statement with respect to the membership or other ownership interest in each Loan Party that owns Properties located in Mexico that is filed with the Secretary of State of the applicable State; and <br><br> (b) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by (i) a perfected first priority security interest and lien on the Collateral of each Loan Party that is not a Property (x) to the extent such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date and (y) excluding claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively "**Avoidance Actions**") (it being understood that notwithstanding such exclusion of Avoidance Actions, upon entry of the Final Order, to the extent approved by the Bankruptcy Court, such lien shall attach to any proceeds of Avoidance Actions); and <br><br> (c) subject to clause (a) above, pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a junior perfected security interest and lien on the any Collateral that is not a Property of each Loan Party to the extent such Collateral is subject to valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and/or inchoate mechanics' and materialmens' liens, or to valid and unavoidable liens in favor of third parties that were in existence immediately |

BHCV/ DC Solar - Loan Facility Term Sheet

|  | prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, subject as to priority to such liens in favor of such third parties; and

(d) pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the Case of such Loan Party (the "**DIP Superpriority Claims**").

All of the liens described above shall be effective and perfected upon entry of the Interim Order, except as otherwise provided herein.  No additional secured debt shall be permitted to be incurred postpetition against the Collateral or the Companies without Lender's consent. |
|---|---|
| *Collateral* | The liens to be granted to the DIP Lender by the Court (the "**DIP Liens**") shall cover all property of the Loan Parties and their estates (now or hereafter acquired and all proceeds thereof), including, but not limited to, real property (leased and owned), assignment of rents, inventory, accounts, equipment, chattel paper, documents, instruments, copyrights, trademarks, trade names, and patents and related rights, general intangibles, claims and causes of action (including commercial tort claims), deposit accounts, cash and cash equivalents, and investment property (including interests in subsidiaries), and all accessions and substitutions thereto and proceeds and products thereof, including insurance proceeds thereof (the "**Collateral**"); provided, however, that with respect to claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, the Collateral shall include only the proceeds of such claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, and not the claims or causes of action themselves.

Notwithstanding the foregoing, the liens and security interests and the super-priority claims of the DIP Lender shall, in each case, are subject and subordinate to the Carve-Out. |
| *Carve-Out* | The liens and super-priority claims granted to the Lender pursuant to the Interim Order and the Final Order shall, in each case, be subject to and subordinate to a carve-out (the "**Carve-Out**") for the payment of (a) following the occurrence of a Triggering Event (as defined below), (i) allowed or subsequently allowed professional fees and expenses incurred by the Companies in an aggregate amount not to exceed $500,000 for services rendered and expenses incurred upon and after the occurrence of a Triggering Event, and (ii) allowed or subsequently allowed professional fees and expenses incurred by a statutory committee of unsecured creditors appointed in the Cases (the "**Committee**") in an aggregate amount not to exceed $150,000 for services rendered and expenses incurred upon and after the occurrence of a Triggering Event (the amounts in items (i) and (ii) being collectively, the "**Carve-Out Amount**" and any such payments being "**Carve-Out Payments**") and (iii) fees pursuant to 28 U.S.C. § 1930 and any fees payable to the clerk of the Bankruptcy Court, and (b) without reducing the Carve-Out Amount, all allowed or subsequently allowed professional fees and expenses incurred by the Companies and the |

BHCV/ DC Solar - Loan Facility Term Sheet

Committee for services rendered and expenses incurred prior to a Triggering Event, to the extent specifically set forth in the DIP Budgets.

Carve-Out Excluding the Properties: The Carve-Out shall be senior to all liens and claims securing the DIP Facility, and the superpriority claims, and any and all other liens or claims securing the DIP Facility, provided, however, that in no event shall the Carve-Out Amount, the Carve-Out Payments or additional fees under §(iii) and §(b) of the paragraph above be senior to or take priority over the Lender's DIP Liens on the Properties.

Carve-Out Including the Properties: In an amount not less than $500,000, the Carve-Out shall be senior to all liens and claims securing the DIP Facility, and the superpriority claims, any and all other liens or claims securing the DIP Facility on the Properties in all instances. In an amount not to exceed $1 million (inclusive of the $500,000 Carve-Out noted above), the Carve-Out shall be senior to all liens and claims securing the DIP Facility, and the superpriority claims, and any and all other liens or claims securing the DIP Facility on the Properties, if, and only if, as of the entry of the Final Order, there is a 50% loan to equity ratio on the Properties in excess of the Loan Amount. The loan to equity ratio shall be reasonably determined by Lender.

As used herein "**Triggering Event**" shall mean the date the DIP Lender provides notice to the Loan Parties, with a copy to Loan Parties' counsel at the address set forth in the Loan Documents, of the termination of the DIP Facility. For clarity, professional fees and expenses payable under the Carve-Out shall only include those fees and expenses that are specifically set forth in the DIP Budgets and that are authorized to be paid pursuant to any administrative fee procedures order entered by the Bankruptcy Court.

No portion of the Collateral, the Carve-Out, or the DIP Facility, shall be used for investigating, preparing for, asserting, commencing, or prosecuting (A) any challenge to the amount, extent, priority, validity, enforceability, or characterization of or the indebtedness under the DIP Facility, (B) any challenge to the validity, priority, perfection, enforceability, or characterization of the liens and security interests securing the DIP Liens (defined below), the collateral securing the Collateral, (C) any other action against the direct or indirect subsidiaries of the Lender, or (D) any challenge of, effort to recharacterize, or defense to either the rights and remedies of the Lender or the Loan Parties' obligations under the Loan Documents.

| | |
|---|---|
| **Conditions to Each Funding and the Maturity Date Extension, if applicable** | The First Draw of the DIP Facility shall be subject to the entry of an Interim Order reasonably acceptable to the Lender.<br><br>The funding of balance of the DIP Facility shall be subject to execution of the Loan Documents, entry of the Final Order reasonably acceptable to the Lender and subject to receipt by Lender of customary deliverables |

|  | including, without limitation, commitments from a title company to issue to Lender one or more Lender's title insurance and UCC-1 policies and/or title continuations, surveys, third party reports, and other items reasonably required by Lender, as applicable.<br><br>On each funding date of the DIP Facility and the Companies' extension of the Maturity Date, if applicable, (i) there shall exist no Event of Default continuing under the Loan Documents, (ii) the representations and warranties of the Loan Parties therein shall be true and correct in all material respects immediately prior to, and after giving effect to, such funding or draw, (iii) the making of such DIP Facility or draw shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, and (iv) with respect to the DIP Facility, the Interim Order or Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed or stayed in any respect or, except as expressly permitted by the Loan Documents, modified or amended in any manner. |
|---|---|
| *Conditions Precedent:* | The Loan Documents will include such conditions precedent as are usual and customary for financings of this kind and consistent with this Term Sheet, including, but not limited to:<br><br>(a)    The Bankruptcy Court shall have entered an Interim Order, in form and substance satisfactory to the Lender (as amended, modified, or otherwise supplemented from time to time), on an application or motion by the Loan Parties, approving the transactions and fees outlined herein and granting the priority liens and administrative expense claims referred to herein.<br><br>(b)    The Lender shall have received all filed "first day" pleadings and "first day" orders filed on the Filing Date, which shall not, in any event, be adverse to the Lender or inconsistent with the terms of the DIP Facility.<br><br>(c)    Delivery by the Loan Parties, and approval by the Lender, of the DIP Budgets. |
| *Financial Reports:* | The DIP Financing Documents will include financial reporting requirements that are usual and customary for the financings of this type, including, without limitation, the following:<br><br>(a)    At least two business days prior to the Closing Date, the Loan Parties will furnish the DIP Lender a budget, in form and substance reasonably satisfactory to the DIP Lender, reflecting a forecast of cash receipts and disbursements for the Loan Parties (on a consolidated basis) for the thirteen-week period beginning the week of the Closing Date, broken down by week, including a detailed line-item listing of all anticipated uses of the DIP Facility for such period (the "**Initial DIP Budget**"). |

BHCV/ DC Solar - Loan Facility Term Sheet

| | |
|---|---|
| | (b)    On Tuesday of each week after the thirtieth (30ᵗʰ) day following the Closing Date, the Loan Parties will furnish the DIP Lender an updated budget, reflecting a forecast of cash receipts and disbursements for the Loan Parties (on a consolidated basis) for the thirteen-week period beginning such week, broken down by week (the "**Updated DIP Budget**"; the Initial DIP Budget and each other Updated DIP Budget delivered to and accepted by the DIP Lender, each a "**DIP Budget**" and collectively the "**DIP Budgets**") and, beginning with the third such Updated DIP Budget so delivered, together with a variance report ("**Variance Report**") setting forth actual cash receipts and disbursements of the Loan Parties for the prior week and setting forth for the period from the Closing Date through the end of such week a comparison to the applicable DIP Budget for the same period, both in dollar and percentage form; each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer of the Loan Parties. |
| ***Budget Compliance*** | The DIP Financing Documents will require that the Companies use proceeds of revenues and financing for actual and necessary expenses of the Companies compliant with Section 503 of the Bankruptcy Code. |
| ***Representations and Warranties, and Affirmative and Negative Covenants*** | The Loan Documents shall contain customary and reasonable representations and warranties, affirmative covenants and negative covenants set forth in the Loan Documents, but expressly excluding any financial or liquidity covenants.<br><br>The Loan Parties, and each of them, represent and warrant that there is no other secured debt on the Properties other than disclosed on Exhibit A.<br><br>By signing this Term Sheet, the Loan Parties, and each of them, represent and warrant that as of the date of this Term Sheet, there are no state or federal arrest or criminal proceedings that have been filed to date, including but not limited to criminal complaints, civil or criminal indictments, information, criminal forfeiture, civil judicial forfeiture and/or administrative forfeiture proceedings involving or against any of the Loan Parties or the Collateral.<br><br>The Loan Parties agree to notify Lender of any state or federal arrest or criminal proceedings that may be filed after the date of this Term Sheet, including but not limited to criminal complaints, civil or criminal indictments, information, criminal forfeiture, civil judicial forfeiture and/or administrative forfeiture proceedings involving or against any of the Loan Parties or the Collateral. |
| ***Events of Default*** | The Loan Documents will include such events of default as are usual and customary for financings of this kind, including, without limitation, the occurrence of any of the following:<br><br>(a)    Breach of any representations, warranties, covenants, or agreements contained in the Loan Documents; |

8 of 11

| | |
|---|---|
| | (b)    Event of Default under the Loan Documents;<br>(c)    Any of the Cases are converted to a case under Chapter 7 of the Bankruptcy Code or is dismissed;<br>(d)    A Chapter 11 trustee or an examiner is appointed in any of the Cases;<br>(e)    Within 30 days after the Filing Date, an order of the Bankruptcy Court is not entered in the Cases approving the DIP Facility on a final basis and in form and substance acceptable to the DIP Lender (as amended, modified or otherwise supplemented from time to time, the "**Final Order**");<br>(f)    Termination of exclusivity for the Plan;<br>(g)    Any Loan Party files a motion to sell assets without consent of the DIP Lender;<br>(h)    The Final Order does not include waivers of Sections 506(c) and 552(b) of the Bankruptcy Code and marshalling;<br>(i)    Either DIP Order is amended, reversed, stayed, vacated, extended, or modified in a way which is not acceptable to the DIP Lender;<br>(j)    The automatic stay is lifted to allow third party to proceed against any material asset of the Loan Parties; and<br>(k)    Any Loan Party files a motion to obtain alternative financing or use Collateral without consent of the DIP Lender.<br>(l)    Breach of any representation, warranty, covenant, or agreement contained in the Loan Documents.<br><br>These Events of Default shall also control this Term Sheet upon the entry of the Interim Order. |
| **Right to Credit Bid** | The Lender will have the right to credit bid the respective amounts of its claims (in full or in part) in connection with the sale of any of the Loan Parties' assets, including, without limitation, any sale occurring pursuant to Section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under Section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code. |
| **Releases/Waiver** | The Loan Parties (a) grant the Lender a release and waiver of all claims arising in respect of the DIP Facility, (b) waive all claims, rights, and powers to surcharge the Lender, the Collateral, and any other property or assets of the Loan Parties subject in any manner whatsoever to the liens and security interests of the Lender (including any replacement liens) pursuant to Section 506(c) or Section 105(a) of the Bankruptcy Code, and (c) waive all rights to a marshaling of the assets of Loan Parties and their estates. |
| **Governing Law** | California law shall govern the Loan Documents except for the Deeds of Trust which shall be governed by the laws of the jurisdiction in which they are recorded (and, to the extent applicable, the Bankruptcy Code). |
| **Submission to Jurisdiction** | Bankruptcy Court of District of Nevada |

| | |
|---|---|
| *Due Diligence* | As a condition precedent to Lender committing to the DIP Facility, Lender must complete its underwriting of and become satisfied with all reports, documents, conditions and other information about the Properties, and must perform a satisfactory site inspection by a representative of Lender. |
| *Indemnification and Expenses* | The Loan Parties agree to indemnify and hold the Lender and its directors, agents, officers, representatives, attorneys, subsidiaries, and affiliates harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or cause of action, and costs and expenses (including reasonable fees, expenses, disbursements, and other charges of outside counsel) incurred, suffered, sustained or required to be paid by an indemnified party by reason of, resulting from or related to the DIP Facility or transactions contemplated thereby, except to the extent resulting from the gross negligence or willful misconduct of the indemnified party. In all such litigation, or the preparation therefor, the indemnified parties shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Loan Parties agree to pay promptly the reasonable fees and expenses of such counsel.<br><br>In connection with its request for the proposed DIP Facility, the Loan Parties understand that the Lender has made certain preliminary financial, legal, and collateral investigations and determinations. Whether or not the DIP Facility is ever approved by Lender or whether the DIP Facility ever closes, the Companies shall be unconditionally obligated to pay all of Lender's reasonable costs and expenses to conduct due diligence, obtain approvals and prepare to close the DIP Facility, including, without limitation, legal fees, title insurance premiums, travel expenses, recording taxes and costs, due diligence fees, and any other costs and expenses reasonably incurred by Lender or Lender (collectively, the "**Costs**"). As a non-refundable advance against such Costs, the Companies shall issue payment to the Lender in the amount of $50,000 within one business day after execution of this Term Sheet. |

**INTENTIONALLY LEFT BLANK - PLEASE CONTINUE TO PAGE 12**

BHCV/ DC Solar - Loan Facility Term Sheet

| | |
|---|---|
| *MAC* | Closing of the DIP Facility and each funding of proceeds is conditioned on: (a) no material adverse change occurring in the business, assets, financial condition, performance or prospects of the Companies, or in the ability of the Companies to operate in accordance with the financial projections and to comply with the representations and/or financial covenants noted herein or in the Loan Documents, (b) no material adverse change or disruption occurring in the capital markets, (c) no litigation or other action pending or threatened seeking an injunction, damages or other relief relating to the financing, and (d) no material change occurring in governmental regulation or policy that materially adversely affects the Companies or Lender. |

This Term Sheet is binding on the parties hereto upon mutual execution and delivery, subject to the conditions precedent set forth herein.

This proposal will expire at 5:00 PM Pacific time on February 4, 2019.

Please sign and return a copy of this Term Sheet to the undersigned on or before the expiration date to evidence you desire to proceed with negotiations.

**LENDER:**

B.H. Capital Ventures, LLC,
a California limited liability company

By: _____
        Arsalan Gozini, Manager

The terms of this Term Sheet are hereby agreed to and accepted by as of _____, 2019:

**PRIMARY LOAN PARTY:**

DC SOLAR SOLUTIONS, INC.

By: _____

Name: _Daniel S Briggs_

Title: Authorized Signatory

BHCV/ DC Solar - Loan Facility Term Sheet

**Collateral Properties**

| Address | City | State | Secured Debt |
|---|---|---|---|
| 250 Arana Dr. | Martinez | CA | |
| 811 Brown St. | Martinez | CA | $130,000 |
| 1619 Greenside Dr. | Round Rock | TX | $168,900 |
| 4101 Lake Tahoe Blvd, #217 | Lake Tahoe | CA | |
| 4101 Lake Tahoe Blvd, #225 | Lake Tahoe | CA | |
| 7373 E. Clubhouse Dr, #14 | Scottsdale | AZ | |
| 1108 Juniper Ave. | Lake Tahoe | CA | |
| 1035 Marie Ave | Martinez | CA | |
| 40 Iris Lane | Walnut Creek | CA | |
| 1208 Roseann Dr. | Martinez | CA | |
| 3143 Old Tunnel Rd. | Lafayette | CA | |
| 180 MidHill Way | Martinez | CA | |
| 31 Morelle Heights | Martinez | CA | |
| 2375 Yale St. | Martinez | CA | |
| 838 Marie Ave. | Martinez | CA | |
| 28 Millthwait Dr. | Martinez | CA | |
| 820 Shell Ave. | Martinez | CA | |
| 1062 Mohr Lane #C | Concord | CA | |
| 4800 Blum Rd, #1 | Martinez | CA | |
| 4800 Blum Rd, #3 | Martinez | CA | |
| 4810 Blum Rd, #5 | Martinez | CA | |
| 30 Pebble Dunes | Las Vegas | NV | |
| 3779 Overlook Ct. | Lake Tahoe | CA | |
| 4901 Park Road | Benicia | CA | $7,199,716 |
| 140 Mason Circle | Concord | CA | $2,319,347 |
| 473-477 East Channel Rd. | Benicia | CA | $1,126,994 |
| 202 Valley View Court | El Sobrante | CA | |
| 207 Valley View Court | El Sobrante | CA | |
| 208 Valley View Court | El Sobrante | CA | |
| 214 Valley View Court | El Sobrante | CA | |
| 2801 VLE | Cabo | Mexico | |
| 2606 VLE | Cabo | Mexico | |
| 3409 VLE | Cabo | Mexico | |
| 1709 VLE | Cabo | Mexico | |
| 1308 VLE | Cabo | Mexico | |
| 3209 VLE | Cabo | Mexico | |
| 1605 VLE | Cabo | Mexico | |
| 2505 VLE | Cabo | Mexico | |