| | | |
|---|---|---|
| 1 | Jeffrey L. Hartman, Esq. | Michael S. Budwick, Esq. #938777 – Admitted *Pro Hac Vice* |
| 2 | Nevada Bar No. 1607<br>**HARTMAN & HARTMAN** | Solomon B. Genet, Esq. #617911 – Admitted *Pro Hac Vice*<br>Gil Ben-Ezra, Esq. #118089 – Admitted *Pro Hac Vice* |
| 3 | 510 W. Plumb Lane, Suite B<br>Reno, Nevada 89509 | Kevin Paule, Esq. #125276 – Admitted *Pro Hac Vice*<br>**MELAND BUDWICK, P.A.** |
| 4 | T: (775) 324-2800 | 3200 Southeast Financial Center<br>200 South Biscayne Boulevard |
| 5 | F: (775) 324-1818<br>notices@bankruptcyreno.com | Miami, Florida 33131<br>T: (305) 358-6363 |
| 6 | | F: (305) 358-1221<br>mbudwick@melandbudwick.com |
| 7 | | sgenet@melandbudwick.com<br>gbenezra@melandbudwick.com |
| 8 | | kpaule@melandbudwick.com |

Attorneys for Christina W. Lovato, Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

In re

DOUBLE JUMP, INC.

Debtor.

Lead Case No.: BK-19-50102-gs
(Chapter 7)

Substantively consolidated with:

| 19-50130-gs | DC Solar Solutions, Inc. |
|---|---|
| 19-50131-gs | DC Solar Distribution, Inc. |
| 19-50135-gs | DC Solar Freedom, Inc. |

**ORDER FOR SUBSTANTIVE CONSOLIDATION OF THE CHAPTER 7 ESTATES OF (1) DOUBLE JUMP, INC., (2) DC SOLAR SOLUTIONS, INC., (3) DC SOLAR DISTRIBUTION, INC., AND (4) DC SOLAR FREEDOM, INC.**

SEE ATTACHED.

_____
Honorable Gary Spraker
United States Bankruptcy Judge



Entered on Docket
March 01, 2021

---

| | |
|---|---|
| Jeffrey L. Hartman, Esq.<br>Nevada Bar No. 1607<br>**HARTMAN & HARTMAN**<br>510 W. Plumb Lane, Suite B<br>Reno, NV 89509<br>T: (775) 324-2800<br>F: (775) 324-1818<br>notices@bankruptcyreno.com | Michael S. Budwick (Admitted *Pro Hac Vice*)<br>Solomon B. Genet (Admitted *Pro Hac Vice*)<br>**MELAND BUDWICK, P.A.**<br>200 S. Biscayne Blvd, Suite 3200<br>Miami, FL 33131<br>T: (305) 358-6363<br>F: (305) 358-1221<br>mbudwick@melandbudwick.com<br>sgenet@melandbudwick.com |

Attorney for Christina Lovato, Chapter 7 Trustee

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>DOUBLE JUMP, INC.<br><br>    Debtor.<br>_____<br><br> X  Affects Double Jump, Inc.<br> X  Affects DC Solar Solutions, Inc.<br> X  Affects DC Solar Distribution, Inc.<br> X  Affects DC Solar Freedom, Inc. | Lead Case No.: BK-19-50102-gs<br>(Chapter 7)<br>Jointly Administered with:<br><br>\| 19-50130-gs \| DC Solar Solutions, Inc. \|<br>\| 19-50131-gs \| DC Solar Distribution, Inc. \|<br>\| 19-50135-gs \| DC Solar Freedom, Inc. \|<br><br>**ORDER FOR SUBSTANTIVE CONSOLIDATION OF THE CHAPTER 7 ESTATES OF (1) DOUBLE JUMP, INC., (2) DC SOLAR SOLUTIONS, INC., (3) DC SOLAR DISTRIBUTION, INC., AND (4) DC SOLAR FREEDOM, INC.**<br><br>**Orig. Hearing Date:  12/10/2020**<br>**Orig. Hearing Time: 9:30 a.m.**<br><br>**Cont. Hearing Date:   2/16/2021**<br>**Cont. Hearing Time:  9:30 a.m.** |

1

The matter came before the Court on the Motion For Order Of Substantive Consolidation Of The Chapter 7 Estates Of (1) Double Jump, Inc., (2) DC Solar Solutions, Inc., (3) DC Solar Distribution, Inc., And (4) DC Solar Freedom, Inc. ("**Motion**"), filed by Christina Lovato ("**Trustee Lovato**"), chapter 7 trustee for the estates of Double Jump, Inc. ("**DJ**"), DC Solar Solutions, Inc. ("**Solutions**"), DC Solar Distribution, Inc. ("**Distribution**"), and DC Solar Freedom, Inc. ("**Freedom**," and together with DJ, Solutions and Distribution, the "**Debtors**"), for an Order substantively consolidating the Debtors' estates, *nunc pro tunc*, to January 30, 2019 ("**Petition Date**") and supporting Declarations as **[ECF Nos. 2324, 2325 and 2326]**. Trustee Lovato was present and represented by Jeffrey Hartman, Michael Budwick and Solomon Genet.

Solar Eclipse Investment Fund VII, LLC, Solar Eclipse Investment Fund VIII, LLC, Solar Eclipse Investment Fund XIV, LLC, Solar Eclipse Investment Fund XXVII, Solar Eclipse Investment Fund XXXII, LLC, and Solar Eclipse Investment Fund XXXV, LLC, and their Investor Members (**"East West/ADHI Parties"**) were represented by Sallie B. Armstrong. The East West/ADHI Parties filed their Objections as **[ECF Nos. 2415 and 2416]**. East West Bank/ADHI withdrew its Objections at **[ECF No. 2539].**

Solar Eclipse Investment Fund III, LLC, Solar Eclipse Investment Fund IV, LLC, Solar Eclipse Investment Fund V, LLC, Solar Eclipse Investment Fund VI, LLC, Solar Eclipse Investment Fund X, LLC, Solar Eclipse Investment Fund XI, LLC, Solar Eclipse Investment Fund XII, LLC, Solar Eclipse Investment Fund XV, LLC, Solar Eclipse Investment Fund XVI, LLC, Solar Eclipse Investment Fund XVII, LLC, Solar Eclipse Investment Fund XVIII, LLC, Solar Eclipse Investment Fund XIX, LLC, Solar Eclipse Investment Fund XXI, LLC, Solar Eclipse Investment Fund XXII, LLC, Solar Eclipse Investment Fund XXIII, LLC, Solar Eclipse Investment Fund XXIV, LLC, Solar Eclipse Investment Fund XXVI, LLC, Solar Eclipse Investment Fund XXVIII, LLC, Solar Eclipse Investment Fund XXIX, LLC, Solar Eclipse Investment Fund XXX, LLC, Solar Eclipse Investment Fund XXXI, LLC, Solar Eclipse Investment Fund XXXIII, LLC, and, Solar Eclipse Investment Fund XXXIV, LLC (collectively, the **"Receivership Funds"**) were represented by Timothy Lukas and Paul Singerman.

Solarmore Management Services ("**Solarmore**") was represented by Nathan Kanute.

Solarmore filed its Joinder as **[ECF No. 2417]**. Solarmore withdrew its Objection at **[ECF No. 2542]**.

SolarSense DCS I, LLC ("**SolarSense**") was represented by Robert Lapowsky. SolarSense filed its Limited Response as **[ECF No. 2376]**.

Cranbrook Realty Investment Fund LP ("**Cranbrook**") was represented by Amy Tirre and Julie Rome-Banks. Cranbrook filed its Limited Objection as **[ECF No. 2369]**.

Benicia Investment, LLC and Benicia Industrial Park, LLC ("**Benicia**") was represented by Matthew Zirzow. Benicia filed its Limited Opposition as **[ECF No. 2371]**.

Majestic Runway Partners II, LLC ("**Majestic**") was represented by Michael DiGiacomo. Majestic filed its Limited Joinder as **[ECF No. 2374]**.

Trustee Lovato filed her Omnibus Reply as **[ECF No. 2397]**.

Pursuant to General Order 2020-14, the hearing was conducted by telephone.

The Court considered the papers filed by the parties and the presentations by counsel and as permitted by F.R.Civ.P. 52, made applicable to this contested matter by F.R.Bankr.P. 7052 and 9014(c), stated its findings of fact and conclusions of law on the record. In addition, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Notice of hearing on the Motion was proper, having been provided pursuant to applicable Rules.

2. As evidentiary support for the Motion, the Court has considered the Lovato and Freeman Declarations, **[ECF No. 2325 and 2326]**, as well as the Declaration of Special Agent Christopher Phillips In Support Of In Rem Forfeiture Complaint ("**FBI Declaration**" or "**Phillips Declaration**") **[ECF No. 106-2]**; and the plea agreements[1] entered into by the United States of America and: (i) Jeffrey Carpoff;[2] (ii) Paulette Carpoff; (iii) Ryan Guidry; (iv) Ronald Roach; (v)

---

[1] The Plea Agreements are admissible for their truth. *See In re Slatkin*, 525 F.3d 805, 811 (9th Cir. 2008); *In re Singh*, 2015 WL 1887939, *9 (Bankr. E.D. Cal. Apr. 22, 2015).

[2] Mr. Carpoff's plea agreement shall be referred to as "**J. Carpoff Plea Agreement**."

Robert Karmann; (vi) Joseph Bayliss; and (vii) Alan Hansen (together, the "**Plea Agreements**").[3] The Plea Agreements are attached to the Lovato Declaration as **Exhibits A through G**.

3.   From on or about CY 2009 through CY 2018, Solutions, Distribution and Freedom[4] (together, "**DC Solar**") were engaged in a business related to manufacturing, marketing, selling and leasing mobile solar generators ("**MSGs**").[5] Jeff Carpoff was, at material times, a senior executive for each of the DC Solar entities.[6]

4.   Although the transactions varied in material respects, generally the business purported to operate as follows. In a single, contemporaneous transaction:

- Solutions would sponsor tax-equity transactions for institutional, corporate and dedicated alternative energy investors through tax equity funds ("**Funds**") to acquire MSGs manufactured by Solutions. Jeff Carpoff represented that a large market existed for end-users of the MGS seeking an alternative to conventional diesel-powered generators and lights.

- Financial advisors marketed the investment opportunity and received placement fees/commissions at each closing. Solutions and the Funds each retained other professionals as well.

- The Funds were structured as "tax-equity funds" in the form of limited liability companies at the outset 99% owned by the financial investor and 1% owned by a Carpoff-affiliated entity as the managing member.

- The 30% Solar Investment Tax Credit effectively allowed the investor to recoup a substantial portion of the investor's initial cash investment, in a Fund in the first year of the investment, subject to the MSGs being placed "in service" per IRS Code.

- Solutions would sell multiple MSGs to a Fund for $150,000 each, in packages of 100 to more than 1,000 MSGs.

---

[3] United States District Court, Eastern District of California, case nos. 2:20-cr-17 JAM, 2:20-cr-0018-TLN, 2:20-cr-3-JAM, 2:19-cr-182-JAM, 2:19-cr-222-JAM, 2:19-cr-182-JAM, and 2:20-cr-016-TLN.
[4] Freedom was incorporated in California on June 12, 2015.
[5] *See generally* J. Carpoff Plea Agreement, pg. 18-25; Phillips Declaration, ¶¶2-11, 32-41.
[6] *See generally* J. Carpoff Plea Agreement, pg. 18-25

- The Funds would pay Solutions a 26% to 30% ($39,000 to $45,000) down payment per MSG.
- Solutions would take back a promissory note for the balance of the purchase price with monthly payments of principal and interest payable over 240 months.
- The Funds would transfer promissory note payments directly to Solutions' bank account. The Funds would neither take possession nor have any direct responsibility for the leasing, operation, or maintenance of the MSGs.
- Instead, as an integral part of a Fund's purchase of MSGs from Solutions, a Fund[7] would contemporaneously enter into a Solar Equipment Lease with Distribution ("**Master Lease**"), pursuant to which a Fund would receive a minimum monthly lease payment. In addition to providing revenue to pay the monthly amounts due pursuant to a Fund's purchase money promissory note to Solutions, entering into the Master Lease with Distribution paired with the Fund's purchase of MSGs was intended to further the investors' tax-equity investment strategy to seek to meet the IRS "in service" requirements to permit the Fund to claim the Solar Tax Credit.
- The monthly rent payable by Distribution to a Fund under the Master Leases equalled or exceeded that Fund's monthly promissory note payments to Solutions.
- Distribution was obligated to make the monthly Master Lease payments to the Funds whether or not it successfully marketed and rented, or sub-leased the MSGs, and generated sufficient revenue from third-parties.
- Monthly rent payable to a Fund by Distribution would be transferred directly from Distribution's bank account to the Fund's bank account.
- Under the terms of the Master Lease, Distribution was responsible for insurance, maintenance and repairs and all other costs of operating the MSGs and to market and sub-lease the MSGs to third-party end-users/sub-lessees.

---

[7] Solar Eclipse Investment Fund IX is an exception to this structure.

5. A pictorial representation generally describing aspects of the typical transaction is attached as **Exhibit A** to the Freeman Declaration.

6. Freedom provided public exposure for the MSGs through marketing, branding and advertising the MSGs and DC Solar in connection with the socially-conscious nature of Solutions' solar energy. Moreover, Freedom also placed MSGs on university campuses and otherwise.[8]

7. Solutions performed predominantly all (if not all) of the management, payroll, facilities, marketing, accounting and administrative work for Solutions, Distribution and Freedom.[9]

8. Solutions funded the significant management, payroll, facilities, marketing, accounting, administrative, professional, operational and other expenses of Distribution and Freedom.[10]

9. Certain DC Solar marketing materials described the business of Solutions, Distribution and Freedom as a single unit.[11]

10. Over the years, Solutions sponsored and closed over thirty transactions aggregating approximately $2,000,000,000 of MSG sales, (purportedly selling over 15,000 MSGs), and generating hundreds of millions of dollars of revenue to Solutions.[12]

11. Because Distribution failed to generate sufficient third-party MSG rental and sublease income, monthly transfers from Solutions to Distribution funded Distribution's Master Lease payment obligations to the Funds.

12. DC Solar had some legitimate business.[13]

---

[8] Freeman Declaration, ¶ 11.
[9] Freeman Declaration, ¶ 9; *see also* Phillips Declaration, ¶43.
[10] Freeman Declaration, ¶ 9.
[11] Carpoff Plea Agreement, pps.18-25; Phillips Declaration, ¶¶42-44.
[12] *See* J. Carpoff Plea Agreement, pg. 20-25; *see also* Phillips Declaration ¶¶18, 11-14.
[13] Phillips Declaration ¶¶16, 18-19, 57, 140-43, 149-50; *see also* J. Carpoff Plea Agreement, pg. 18-25.

13. However, certain of DC Solar's insiders, including Jeff Carpoff and his wife, Paulette Carpoff (together, the "**Carpoffs**"), were also perpetrating a Ponzi-like fraudulent scheme ("**Carpoff Scheme**"), through and upon DC Solar and other entities.[14][15]

14. The Carpoffs caused Solutions to transfer monies obtained from new purchasers of MSGs (the Funds) to cover obligations owed by Distribution to earlier (and other) purchasers of MSGs (the Funds) and to cover other obligations of DC Solar, to be paid by Solutions and Distribution. This was contrary to the Carpoffs' representations (directly or indirectly) to the financial investors that sub-lessee revenue from third-parties would pay those obligations. And while the Carpoffs (directly and indirectly) communicated to the financial investors that DC Solar had manufactured a certain number of MSGs, the actual figure was far less and certain Funds paid for MSGs that did not, in fact, exist or that had already been sold to other Funds. Moreover, although the Carpoffs (directly or indirectly) represented to the financial investors that DC Solar had a series of sub-lessees willing to pay to utilize the MSGs, some sub-leases were real, but others were not.[16]

15. Based upon information provided by a whistleblower, in or around mid-2018, federal law enforcement investigated the Carpoffs ("**Investigation**").[17]

16. As a result of the Investigation, on December 18, 2018, federal law enforcement raided Carpoff-affiliated offices, including the business offices of Solutions, Distribution and Freedom, and seized business and operating records as well as numerous bank accounts ("**Raid**").[18] The Raid effectively shut down DC Solar.[19]

17. Following the Raid, the Debtors made certain corporate changes, including the retention of Seth Freeman and GlassRatner Advisory & Capital Group, LLC ("**GlassRatner**") and

---

[14] Plea Agreements, *passim*; Phillips Declaration.
[15] Certain other DC Solar-insiders, including those with a range of authority and access, including holding executive-level positions and otherwise, acted without knowledge of the Carpoff Scheme or any wrongdoing.
[16] Plea Agreements, *passim*; *see also* Phillips Declaration, ¶¶16-21, 29, 18, 57.
[17] Phillips Declaration, ¶28 et seq.
[18] Phillips Declaration, *see also* J Carpoff Plea Agreement, pg. 24.
[19] Freeman Declaration, 2.

appointed Wyatt Wachtel and William Keenan as independent directors.[20]

18. The Debtors' ownership structure as of the Petition Date, was generally as follows:

- DJ was incorporated on May 29, 2013 as a Nevada corporation and its shareholders were Jeff Carpoff (50%) and Paulette Carpoff (50%). DJ owns all the issued and outstanding equity of Solutions and Distribution. DJ has no other assets, operations, or liabilities.
- Solutions, formerly known as DC Solar Solutions MFG, Inc., was incorporated on July 30, 2009, as a California corporation. In 2017, Solutions registered to do business in Nevada.
- Distribution was incorporated on September 29, 2010, as a California corporation, and was registered to do business in Nevada as a foreign corporation since 2017.
- Freedom was incorporated on June 12, 2015, as a California benefit corporation. Freedom's shareholders are Jeffrey Carpoff (39.475%), Paulette Carpoff (39.475%), Ryan Guidry (5.26%), Ron Roach (5.26%), Julie Muraco (5.26%), and Ari Lauer (5.26%).[21]

19. The following description of Solar Eclipse Investment Fund XVIII illustrates one Solutions-sponsored tax-equity Fund transaction, although certain transactions were different and certain transactions were materially different.[22]

20. In August 2015, GEICO Corporation ("**GEICO**") agreed to invest in a newly formed single-investor tax-credit fund sponsored by Solutions named Solar Eclipse Investment Fund XVIII ("**Fund XVIII**") to acquire a portfolio of 1,140 MSGs manufactured by Solutions at the total price of $171,000,000.

21. Fund XVIII was capitalized with a total sum of $51,687,000. Geico agreed to invest $51,179,130 in Fund XVIII, representing 99% of the Fund's capital, over 6 installments, timed with the delivery of groups of Solutions MSGs. The remaining $507,870, equivalent to 1%, was contributed by the Managing Member, Solarmore Management Services, Inc., owned by Carl Jansen.

22. $1,964,633 of Fund XVIII's capitalization was used to establish a Debt Service

---

[20] Freeman Declaration, 3.
[21] ECF No. 12, pgs. 1 - 12.
[22] Lovato Declaration; *see also, generally* J. Carpoff Plea Agreement, pg. 20-24; *cf.* Phillips Declaration, ¶¶2-11, 32-41.

8

1 Reserve per the "6th Group Certificate" signed by Fund XVIII.

23. As a tax-equity deal, Fund XVIII's total capitalization of $51,687,000 was structured to be equivalent to approximately 30% of the $171,000,000 total purchase price of the DC Solar MGSs, allowing the investor, in this case, GEICO, to recover substantially all of its cash investment by taking advantage of the 30% Solar Tax Credit.

24. The Fund XVIII bank account was established at the same bank at which both Solutions and Distribution maintained their bank accounts, facilitating transfers between bank accounts. Jeff and Paulette Carpoff were among the authorized signers of the Fund XVIII bank account and Solutions' CFO had authority to transfer funds from the Fund XVIII bank account.

25. Fund XVIII, as the purchaser, entered into a Solar Equipment Purchase Agreement with Solutions as the seller ("**Fund XVIII Purchase Agreement**"). The Fund XVIII Purchase Agreement was for 1,140 MSGs at $150,000 each for an aggregate purchase price of $171,000,000.

26. In accordance with the Fund XVIII Purchase Agreement, Fund XVIII paid Solutions an aggregate down payment of $45,413,941 equivalent to 26.56% and executed a series of secured promissory notes ("**Fund XVIII Notes**") payable to Solutions in the aggregate sum of $125,586,059 representing 73.44% of the transaction, with monthly principal and interest payments of $673,502 for 240 months. Fund XVIII was the maker and Solutions was the holder of the Fund XVIII Notes.

27. Repayment of the Fund XVIII promissory notes due to Solutions was secured by a lien against the MSGs with Solutions as the named lienholder on the California Department of Motor Vehicle registration for each MSG.

28. Fund XVIII concurrently entered into a Solar Equipment Lease with Distribution under which Distribution paid Fund XVIII a minimum monthly base master lease payment of $837,900, equivalent to $735 per MSG per month, and was responsible for managing and sub-leasing the MSGs to third-party users.

29. Fund XVIII would, in turn, use the minimum monthly Master Lease payment from Distribution to make the $673,502 monthly promissory notes payment of principal and interest

due to Solutions on the Fund XVIII Notes.

30. The Fund XVIII structure resulted in a monthly cash-flow deficit of $164,398 ($1,972,776 annualized), prior to Distribution generating any third-party MSG rental or sub-lease income. In addition, Distribution incurred expenses associated with managing, operating, maintaining and insuring the Fund XVIII MSGs.

31. However, Distribution did not generate sufficient third-party rental or sublease revenue. Solutions transferred to Distribution each month an amount equal to the Base Lease to enable Distribution in turn to pay Fund XVIII.

32. As illustrated in the Freeman Declaration, Exhibit A diagram, $837,900 was transferred from Solutions' bank account to Distributions' bank account to enable Distribution to pay the Master Lease Payment to Fund XVIII. In turn, the Solutions CFO caused Fund XVIII to transfer $673,502 back to Solutions in order to make Fund XVIII's monthly promissory note payment to Solutions.

33. As a further part of the transaction, both Solutions and Distribution provided a Limited Guaranty for certain obligations to Fund XVIII, including the obligations of the Managing Member to assure that the MSGs would be "placed in service" in accordance with IRS Code, and to lend funds to Fund XVIII to cover operating deficits during the 5-year recapture period. The Limited Guaranty was executed by Jeff Carpoff as president of Solutions and Paulette Carpoff as president of Distribution.

34. The Debtors filed voluntary chapter 11 petitions commencing these Bankruptcy Cases between January 30 and February 5, 2019.[23]

35. The Bankruptcy Cases were converted to cases under chapter 7 of the Code and on March 22, 2019 Trustee Lovato was appointed as chapter 7 trustee.[24]

36. After her appointment, Trustee Lovato traveled to DC Solar's offices in Benicia, California and took possession of the computer servers at that location ("**Servers**").[25] The Servers

---

[23] *See* dockets (DJ filed on January 30, 2019; Solutions filed on February 3, 2019; Distribution filed on February 4, 2019; and Freedom filed on February 5, 2019).
[24] ECF Nos. 438 & 439.
[25] Lovato Declaration.

contained DC Solar-related Quickbooks records and other electronic data. GlassRatner, the Trustee's financial advisor, also had (and maintains) direct access to the information on the Servers.

37. Although Distribution and Freedom were separate legal entities, they were, nevertheless, largely funded by Solutions.[26] After the Trustee was appointed, she directed GlassRatner to review certain transactions regarding the sources and uses of funds, including the funding for Distribution and Freedom.[27]

38. GlassRatner prepared an analysis of the sources of funds into Distribution for the four-year period from February 3, 2015 to February 4, 2019. During that four-year period Distribution received a total of $396,953,812 into its bank accounts. Solutions was the source of $360,897,631 or approximately 91% of the $396,953,812 received by Distribution during the four-year period. Approximately 9% or $35,700,000 was received from other parties.

39. During the four-year time period, Solutions transferred over $9,000,000 to or for the benefit of Freedom.

40. The $360,897,631 transferred from Solutions to Distribution funded the monthly circular transactions of Master Lease Base Rent payments from Distribution to the Funds and the Funds' transfers back to Solutions in the form of monthly promissory note payments.

41. Based upon a review of the Debtors' books and records (including from the Server), GlassRatner was unable to locate documentation evidencing promissory notes and other formalities documenting the numerous transfers between Solutions, Distribution and Freedom which typically would be present in arms-length transactions (repayment terms, for example).[28]

42. GlassRatner has identified audited financial statements of Solutions for certain years and unaudited financial statements (compilations) of Distribution for certain years, the latter prepared by Ron Roach.

43. A Notice of Second Extended Bar Date was set as February 14, 2020.[29]

---

[26] Freeman Declaration, ¶¶ 12-15; Phillips Declaration ¶¶16, 167-69, 172, 176.
[27] Freeman Declaration, ¶ 12.
[28] Freeman Declaration, ¶ 33.
[29] ECF No. 1472.

11

1  Substantially all the Funds and financial investors filed claims in each of the DJ, Solutions, Distribution and Freedom cases. Those claims total approximately $3.9 billion in each of the four Debtor cases. In addition, to the Fund claims, there are general unsecured claims across four Debtor cases:

|            | Fund Claims      | General Unsecured |
|------------|------------------|-------------------|
| Double Jump | $3,842,062,050 | $   1,498,976     |
| Solutions  | $3,918,311,081   | $340,140,438      |
| Distribution | $3,918,311,081 | $   9,751,338     |
| Freedom    | $3,849,161,897   | $        19,523   |

## CONCLUSIONS OF LAW

44.  This Motion is a core proceeding in the Debtors' chapter 7 cases and a "matter concerning the administration of the estate," 28 U.S.C. § 157(b)(2)(A). It is a core proceeding because it arises under the Bankruptcy Code and in the underlying bankruptcy cases. Bankruptcy jurisdiction is proper by reason of 28 U.S.C. §§ 1334(b) and 157(a), and LR 1001(b)(1). A bankruptcy judge has authority from the face of the statute, 28 U.S.C. § 157(b)(1), to "hear and determine," i.e., to make a final order or to order final judgment, in a core proceeding under 28 U.S.C. § 157(b)(2)(A). (An order disposing of a motion for substantive consolidation is generally recognized as a final order for the purposes of jurisdiction and judicial authority. *In re Bonham*, 229 F.3d 750, 762 (9th Cir. 2000). Bankruptcy Courts have the authority to order substantive consolidation of debtors pursuant to 11 U.S.C. §105.[30] The aim of substantive consolidation is "fairness to all creditors," notwithstanding that it almost invariably redistributes wealth among the creditors of various entities because those entities (to be consolidated) are likely to have differing debt-to-asset ratios.[31]

45.  The Ninth Circuit BAP recently recited as follows:

Substantive consolidation is an uncodified, equitable doctrine allowing the

---

[30] *In re Bonham*, 229 F.3d 750, 758 & 764 (9th Cir. 2000).
[31] *In re Bonham*, 229 F.3d 750, 762-764 (9th Cir. 2000); *see also In re Mihranian*, 937 F.3d 1214, 1216-18 (9th Cir. 2019).

> bankruptcy court, for purposes of the bankruptcy, to "combine the assets and liabilities of separate and distinct—but related—legal entities into a single pool and treat them as though they belong to a single entity." *In re Bonham*, 229 F.3d at 764. Although it is a case-by-case inquiry, the Ninth Circuit has adopted a two factor test to guide the determination of whether substantive consolidation is appropriate: "(1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (2) whether the affairs of the debtor are so entangled that consolidation will benefit all creditors." *Id.* at 766. Either factor is sufficient to support substantive consolidation. *Id.*
>
> However, "when the *Bonham* case is considered in its complete context, it is clear that the Ninth Circuit did not require bankruptcy courts to look only to the two [factors]... set forth above, in some 'Pavlovian' way." *In re Bashas' Inc.*, 437 B.R. 874, 929 (Bankr. D. Ariz. 2010) (*citing in re Bonham*, 229 F.3d at 767). "<u>The basic rules, and the discretion to apply them, stem solely and completely from a weighing of the equities, and a decision which emanates from one guiding light: "Is this reasonable under the circumstances?"</u> *Id.* at 929. [32]

Although the second factor which guides the analysis recites a "benefit [to] all creditors," this does not mean each-and-every creditor but rather the creditor body as a whole.[33] The doctrine of substantive consolidation is flexible as well as equitable. In many ways, the doctrine was created to do equity when a debtor has acted inequitably. That there is inherent imprecision and, consequently, some potential prejudice to a creditor when assets and liabilities are consolidated is a given. In fact, the *Bonham* test requires an evaluation of whether the benefits of consolidation outweigh any such harm. And the second factor emphasizes the entanglement of affairs, where the time and expense to unscramble them and properly allocate assets and liabilities is so substantial as to threaten the realization of net assets for all the creditors or where no accurate identification and allocation of assets is possible.[34]

Also, courts have found substantive consolidation to be an appropriate remedy where a

---

[32] *In re Mihranian*, 2017 WL 6003345 (B.A.P. 9th Cir. Dec. 4, 2017) (emphasis added), aff'd, 937 F.3d 1214 (9th Cir. 2019).

[33] *In re Mihranian,* 2017 WL 6003345, *4 (B.A.P. 9th Cir. Dec. 4, 2017), aff'd, 937 F.3d 1214 (9th Cir. 2019) *citing In re Bonham*, 229 F.3d at 766, 767.

[34] *In re Clark*, 525 B.R. 107, 129 (Bankr. D. Idaho 2014) (notations omitted, emphasis added), aff'd, 548 B.R. 246 (B.A.P. 9th Cir. 2016), aff'd, 692 F. App'x 946 (9th Cir. 2017).

debtor-insider(s) perpetrated a Ponzi scheme through debtor (and non-debtor) entities.[35]

46. In the Motion, Trustee Lovato asserted satisfaction of the second factor, *i.e.*, whether the debtor's affairs are so entangled that consolidation will benefit the creditor body as a whole, and the overarching concept that substantive consolidation is a flexible and equitable remedy, for which the "one guiding light" is whether the relief is "reasonable under the circumstances." The Court agrees with Trustee Lovato that the following items, sourced from decisional law,[36] support the requested relief:

(1) <u>The Carpoff Scheme</u>

Mr. Carpoff and his debtor-insider co-conspirators perpetrated the Carpoff Scheme through and upon the Debtors (and other entities).

(2) <u>Unity of ownership between the Debtors</u>

As of the Petition Date: (i) Mr. and Mrs. Carpoff owned 100% of the equity interest in DJ; (ii) through DJ, Mr. and Mrs. Carpoff owned 100% of the equity interests of Solutions and Distribution; and (iii) Mr. and Mrs. Carpoff owned the majority of the interests in Freedom.[37]

(3) <u>Presence or absence of consolidated business or financial records</u>

The Debtors caused an accounting firm to audit Solutions' financial statements and the accounting firm of Ronald Roach, CPA, to perform compilations of Distribution's financial statements. However, Mr. Karmann (Solutions' CFO), Mr. Roach, Mr. Bayliss, Mr. Guidry and Mr. Hansen have each pled guilty to crimes in connection with the Carpoff Scheme, "and as part of their respective plea agreements have stated that the Carpoff Scheme perpetrated by Jeffrey

---

[35] *See e.g., In re Bonham*, 229 F.3d 750, 766 (9th Cir. 2000); *In re Woodbridge Grp. of Companies, LLC*, 592 B.R. 761 (Bankr. D. Del. 2018); *In re Petters Co., Inc.*, 506 B.R. 784 (Bankr. D. Minn. 2013); *see also In re Int'l Mgmt. Assocs., LLC*, 2012 WL 2105908, at *4 n.12 (Bankr. N.D. Ga. Apr. 3, 2012) (citing to Order Granting Trustee's Motion for Substantive Consolidation of the Debtors' Estates (April 17, 2008), Case No. 06–62966, Docket No. 607).

[36] *See e.g., In re Clark*, 525 B.R. 442, 454 (Bankr. D. Idaho 2015), aff'd 2016 WL 1377807 (B.A.P. 9th Cir. Mar. 29, 2016), aff'd 693 F. App'x 644 (9th Cir. 2017).

[37] At different times, there were certain Debtors insiders with varying level of control, responsibility and access who acted without knowledge of the Carpoffs' and other insiders' wrongdoing. Some of these individuals were owners, officers and/or directors of the Debtor. However, this factor remains meaningfully satisfied.

1  Carpoff, Paulette Carpoff and other individuals was a Ponzi scheme.". See, ECF Nos. 2326-3, 4,
2  5, 6 and 7. Therefore, there are no trustworthy and separate financial records for each Debtor.

(4) Degree of Difficulty in Ascertaining the Individual Debtor's Assets and Liabilities

It would be prohibitively expensive to create a separate set of accurate books and records on a standalone basis for each of the Debtors.[38] For approximately eight years, the Carpoffs and certain other Debtor-insiders perpetrated the Carpoff Scheme through and upon the Debtors and other entities. Further, the Carpoffs operated the Debtors as a single business operation (with differing roles) for purposes of its tax-advantaged transactions, with Solutions (largely) funding Distribution and Freedom. And the U.S.A.'s criminal investigation is ongoing, which has impacted Trustee Lovato's ability to obtain and review all of the Debtors' records.

Accurately re-creating each of the Debtors' individual assets and liabilities would not only be prohibitively expensive and thereby diminish the realization of net assets for all the creditors, it would most probably require business judgments that have the potential to create more confusion and less predictability between and among parties-in-interest and the administration of this Bankruptcy Case.[39]

(5) Entanglement of Business Affairs

The Debtors' business affairs were materially entangled. As described above: (i) there is a unity of interest between and among the Debtors; (ii) the Carpoff Scheme was perpetrated by the Carpoffs and certain other Debtor-insiders through and upon each of the DC Solar entities, with DJ serving as a holding company; (iii) Solutions (largely) funded Distribution and Freedom; and (iv) administrative and back-office personnel all worked for Solutions.[40] Also, Solutions' source of revenue was its tax-advantaged investment offerings, in which both Distribution and Freedom

---

[38] Lovato Declaration, ¶15.
[39] *In re Clark*, 548 B.R. 246, 251 (B.A.P. 9th Cir. 2016), aff'd, 692 F. App'x 946 (9th Cir. 2017) (in describing the bankruptcy court's ruling, which it affirmed, the Ninth Circuit B.A.P. stated as follows: "In considering the second factor under *Bonham*, the [bankruptcy] court concluded that the evidence showed the financial affairs of Debtor, the LLC, and the Trust were so entangled that unraveling them would require significant time, effort, and expense, and there was no realistic assurance that the result would be accurate or without potential injury.").
[40] Freeman Declaration; Plea Agreements.

played instrumental roles and were extensively interrelated.

Finally, Solutions and Distribution were jointly obligated in the typical transaction (*i.e.,* Fund XVIII) in connection with the purchase of MSGs. These intercorporate guarantees on debts demonstrate and highlight the entanglement of the Debtors' business affairs.

(6) <u>Transfers Between and Among the Debtors without Observing Corporate Formalities and Commingling of Assets and Business Functions</u>

Solutions largely funded Distribution and Freedom through transfers made without observing corporate formalities. The Trustee has been able to locate minimal (if any) loan documentation or corporate formalities (interest rate, security interest, repayment schedule, etc.) utilized in memorializing or tracking or these transfers. Moreover, the Debtors comingled their business functions, including administrative and accounting personnel.

(7) <u>Analysis of the Proofs of Claim</u>

A combined total of more than $16 billion in claims have been filed in the four Debtor cases. Approximately 96% of those claims are duplicative, i.e., the same claims have been filed in all four cases. The bulk of the claims are asserted by the investment funds or investors ("**Investor Claims**"). The Investor Claims are based on varying methodologies: (i) some are based upon the amount of cash invested into a particular Fund; (ii) some are based upon the overall purchase price (including the 30% down payment and the obligation resulting from the promissory note portion of the transaction); (iii) some assert damages related to the solar tax credit component of the transactions, and (iv) some include contingent tort claims. Importantly, in substantially all of the Investor Claims, Solutions and Distribution were integral parties to the transaction and Solutions was a guarantor of certain obligations to be performed by Distribution. It would be difficult and expensive to pursue and complete a reconciliation process to, for example, differentiate between claims resulting from a direct investment with Solutions relative to the guarantee claims against Distribution.[41]

---

[41] The Investor Claims are liquidated and will receive no distribution pursuant to a settlement reached between the Investors and the Trustee at ECF No. 2482.

47. Absent substantive consolidation, the Trustee and the Debtors' estates will be burdened with significant expense in reconciling these claims as between the different estates.

48. Trustee Lovato's requested relief of substantive consolidation combines the assets and liabilities of separate and distinct, but related, legal entities into a single pot as though they belong to a single entity. All claims against the consolidated debtor entities will be paid from the single pot and all inter-company claims will be extinguished.

49. Further, establishment of a single Petition Date of February 4, 2019,[42] will ease the administration of the estates. For avoidance of doubt, the Trustee's requested relief will: (1) preserve for the estate any avoidance actions held by any of the Debtors pursuant to 11 U.S.C. §§ 544, 548 and 550 (including under applicable state law) as to any transfers made by such Debtor; and (2) limit the security interest of any creditor of any debtor strictly to the specific collateral held by such creditor prior to substantive consolidation.

The Debtors dealt with third parties as a single operating unit and the affairs of the Debtors are extensively entangled. Moreover, without consolidation, Trustee Lovato and the estates will face prohibitively expensive challenges to untangle this financial web.

Based upon the entire record in each of these four, jointly administered cases, of which the Court takes judicial notice, and good cause appearing,

**IT IS ORDERED** that the Motion is granted; and

**IT IS FINALLY ORDERED** that the consolidation is effective as of February 4, 2019.

Submitted by:

**HARTMAN & HARTMAN**

/s/ *Jeffrey L. Hartman*
Jeffrey L. Hartman, Esq.,
Attorney for Christina Lovato, Trustee

---

[42] See *Bonham*, 229 F.3d at 764; *Clark's Crystal Springs Ranch, LLC v. Gugino*, 548 B.R. 246 (9th Cir. BAP 2016).

17

**MELAND BUDWICK, P.A.**

/s/ *Michael S. Budwick*
Michael S. Budwick, Esq., (Admitted Pro Hac Vice)
Solomon B. Genet, Esq. (Admitted Pro Hac Vice)
Attorneys for Christina Lovato, Trustee


Approved:

**LARSON & ZIRZOW, LLC**

/s/ *Matthew C. Zirzow*
Matthew C. Zirzow, Esq.
Attorneys for Benicia Investment, LLC
and Benicia Industrial Park, LLC

Approved:

**BALLARD SPAHR LLP**

/s/ *Michael A. Digiacomo*
Michael A. DiGiacomo, Esq.
Attorneys for Majestic Runway Partners II, LLC




###

**ALTERNATIVE METHOD Re: RULE 9021**

In accordance with Local Rule 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that (check one):

____ The court has waived the requirement set forth in LR 9021(b)(1).

____ No party appeared at the hearing or filed an objection to the paper.

__X__ I have delivered a copy of the proposed order to all counsel who appeared at the hearing, any trustee appointed in this case and any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond as indicated below.

*Trustee's Counsel:*

__X__ Prepared / Approved the form of this order

____ Waived the right to review the order and/or

____ Appeared at the hearing, waived the right to review the order

____ Matter unopposed, did not appear at the hearing, waived the right to review the order

____ Disapproved the form of this order

____ Did not respond to the paper

*U.S. Trustee:*

____ Approved the form of this order

____ Disapproved the form of this order

____ Waived the right to review the order and/or

____ Did not respond to the paper

__X__ Did not appear at the hearing or object to the paper

____ I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objected to the form or content of the order.

I declare under penalty of perjury that the foregoing is true and correct.

Submitted by:
**HARTMAN & HARTMAN**

/s/ *Jeffrey L. Hartman*
Jeffrey L. Hartman

19